**LIBERTY NAT. BANK OF SOUTH CAROLINA, AT COLUMBIA, et al. v. McINTOSH, Comptroller of Currency, et al.**

**McINTOSH, Comptroller of Currency, et al. v. LIBERTY NAT. BANK OF SOUTH CAROLINA, AT COLUMBIA, et al.**

(Circuit Court of Appeals, Fourth Circuit. January 11, 1927.)

Nos. 2558, 2569.

1. **Banks and banking** ⊙⟹248(2)—Comptroller of Currency properly appointed receiver and assessed stockholders on assuming jurisdiction of national bank after another bank repudiated contract for liquidation (National Bank Act June 30, 1876, §§ 1, 2, 3 [Comp. St. §§ 9807, 9826, 9827]).

Under National Bank Act June 30, 1876, §§ 1, 2, 3 (Comp. St. §§ 9807, 9826, 9827), Comptroller of Currency properly appointed receiver, and assessed shareholders of national bank on assuming jurisdiction of the affairs thereof, after another bank had repudiated contract entered into for liquidation of its affairs.

2. **Banks and banking** ⊙⟹248(2)—Comptroller of Currency's jurisdiction in respect to liquidation of national banks is exclusive.

Jurisdiction of Comptroller of Currency in respect to all matters properly within his discretion relative to liquidation of national banks is exclusive, and his action therein is not subject to review.

3. **Banks and banking** ⊙⟹248(2)—Decisions of Comptroller of Currency are not subject to collateral attack, nor is his assessment against shareholders reviewable, in absence of fraud.

Decisions of Comptroller of Currency relative to liquidation of national banks are not subject to collateral attack, nor is his assessment against shareholders, and amount thereof open to review, in absence of fraud.

4. **Banks and banking** ⊙⟹287(3)—Receiver, taking possession of assets of national bank on appointment by Comptroller of Currency, assumes control thereof as officer of United States.

Where Comptroller of Currency appoints a receiver of a national bank, receiver takes possession of assets of bank and assumes control of its operation, not as agent of bank, but as officer of the United States.

5. **Appeal and error** ⊙⟹447—Trial court held to have improperly granted injunction pending appeal from decree denying injunction, in absence of peculiar circumstances warranting it (Judicial Code, § 129 [Comp. St. § 1121]).

Trial court held to have improperly granted injunction pending appeal from decree refusing to enjoin Comptroller of Currency from collecting assessment against shareholders of national bank, since, although such appeal is authorized under Judicial Code, § 129 (Comp. St. § 1121), effect of granting injunction operates as securing relief denied on original application, which is abuse of discretion, in absence of peculiar circumstances warranting it.

Appeals from the District Court of the United States for the Eastern District of South Carolina, at Charleston; Ernest F. Cochran, Judge.

Suit by the Liberty National Bank of South Carolina, at Columbia, and others against J. W. McIntosh, as Comptroller of the Currency of the United States, and another. From a decree denying an injunction, plaintiffs appeal; and from a subsequent order, enjoining and restraining defendants pending the appeal, defendants separately appeal. Affirmed as to first appeal, and reversed as to second appeal.

D. W. Robinson and William M. Shand, both of Columbia, S. C. (Benet, Shand & McGowan, of Columbia, S. C., and George Bell Timmerman, of Lexington, S. C., on the brief), for plaintiffs.

R. Beverley Herbert, of Columbia, S. C., and John K. Shields, of Tate, Tenn., for defendants.

Before WADDILL, ROSE, and PARKER, Circuit Judges.

WADDILL, Circuit Judge. These two causes grow out of proceedings to liquidate the affairs of the Liberty National Bank of South Carolina, at Columbia, and were argued together in this court, and will be disposed of in one opinion.

The Liberty National Bank of South Carolina, at Columbia, hereinafter referred to as the Liberty Bank, filed its bill and amended bill in equity in the first-named cause in the court below, praying that the action of the

Comptroller of the Currency, named as a defendant therein, in appointing the codefendant, Malcolm S. McConihe receiver of said bank, be declared void, and that the attempted levy and collection of an assessment on the shareholders of said bank by the defendants, in their official capacity, be enjoined and restrained. The bill briefly alleged that the Liberty Bank had entered into voluntary liquidation under contract with the National Loan & Exchange Bank of Columbia (hereinafter referred to as the Exchange Bank), which latter bank was to act as liquidator of the former, assuming to pay certain liabilities, and to be reimbursed by the Liberty Bank for any deficit.

The original contract between the two banks was regularly entered into on the 23d of October, 1923, and pursuant to a subsequent resolution of the board of directors, and by agreement between the banks clause 6 was added thereto. By the agreement thus entered into, the Liberty Bank transferred all of the assets of every kind of the bank to the Exchange Bank, the Exchange Bank guaranteeing payment to the depositors of the Liberty Bank of the amount of their deposits therein, and also other obligations of the Liberty Bank for bills payable and rediscounts at the close of business on the 22d day of October, 1923, as shown by Exhibit A attached to the contract, with a proviso that the Exchange Bank did not guarantee any liability of said Liberty Bank to its stockholders, or any other liabilities of said Liberty Bank except those thereinbefore set forth. Under this contract the Exchange Bank at once possessed itself of all the assets and effects of the Liberty Bank, including its banking house, and proceeded to administer and liquidate the assets of the bank as rapidly as in its judgment was deemed advisable and advantageous, and it was provided that, after reimbursing itself for all expenses, not, however, to include commissions to the Exchange Bank (the latter bank making no charge for its services in the administration and liquidation of the affairs of the Liberty Bank and collecting and converting its assets into cash), together with all the advancements made on account of said Liberty Bank, and of all indebtedness of the Liberty Bank to the Exchange Bank of every character, and that the residue of the assets of said Liberty Bank should be turned over to it for distribution among its stockholders.

Provision also was made for the liquidation and winding up of the affairs of the Liberty Bank by and under the supervision and direction of the Exchange Bank, but the Liberty Bank reserved the right, through its appropriate committees and representatives, to consult and advise daily with the Exchange Bank as to the administration and liquidation of the assets of the Liberty Bank, and also reserved the right to direct in writing the proper disposition of certain of its bills receivable and choses in action as it might be advised to, and the books of the Exchange Bank were to be open to the inspection of a representative of the Liberty Bank. It was further provided that the Exchange Bank should not be liable to the Liberty Bank for any losses in connection with the liquidation and collection of the assets of the latter bank conveyed and transferred to it, except such as arose from gross negligence on its part or its agents. The Liberty Bank stipulated that it would save harmless the Exchange Bank from and against any and all losses, should there be any, which the Exchange Bank might sustain on account of the failure to realize from the assets and property of the Liberty Bank sufficient to reimburse the Exchange Bank for all amounts which it might expend in carrying out the provisions of the contract, and upon final completion of the liquidation to pay any such deficiency to said Exchange Bank.

The bill further charged that the Comptroller was cognizant of and approved the contract of liquidation, and that thereafter the Exchange Bank, not having lived up to its contract, sought to have the Comptroller assume jurisdiction of the affairs of the Liberty Bank, and to appoint a receiver to take charge, which the Comptroller at first refused to do, but subsequently did, and ordered an assessment of $250,000 against the shareholders of the Liberty Bank for the purpose of meeting its obligations, when the amount so due, in addition to the indebtedness ascertained by the Comptroller in favor of the Exchange Bank, to wit, $453,008.10, was not in excess of $6,000. The Liberty Bank also denied its liability to the Exchange Bank for the sum so adjudged against it, as it did the power of the Comptroller to make such adjudication and assessment against shareholders, and insisted that such adjudication and assessment could only be made by a court of competent jurisdiction having authority to wind up the affairs and assess shareholders in insolvent national banks in liquidation.

On the filing of the bill, the court awarded a rule against the defendants to show cause of July 27th why the interlocutory injunction should not be issued as prayed for, whereupon the defendant Comptroller of the Currency specially appeared for the purpose of contesting the jurisdiction of the court. The said defendant Comptroller and his codefendant,

the receiver, upon the court's overruling the plea to the jurisdiction, each moved the court to dismiss the bill for lack of equity, and the receiver duly made return to the said rule, showing his appointment and what he had done thereunder, with affidavits and records in support thereof. From said report it appears that assets came into his hands as follows:

| | |
|---|---:|
| Good | $ 138,453.93 |
| Doubtful | 63,980.69 |
| Worthless | 844,719.48 |
| Total | $1,047,154.10 |

From the first two items, the receiver hoped to realize $164,865.68. The receiver denied that his appointment was because of solicitation or importunity of the Exchange Bank, but was solely the result of a long and careful investigation and examination by the Comptroller of the affairs of the Liberty Bank, and, having become satisfied of its insolvency, the receiver was appointed, and the Comptroller thereafter directed the assessment of the shareholders to cover the indebtedness of the Liberty Bank.

On the 28th of July, the court, having overruled the objection to the jurisdiction of the court, entered an order declining to enjoin the Comptroller from exercising the powers conferred upon him by law, and denied the injunction asked for to restrain the receiver from proceeding with the collection of the shareholders' assessments theretofore ordered by the Comptroller. From this action the appeal in the first-named cause, No. 2558, was taken.

On the 4th of August, 1926, the Liberty Bank applied to the District Court of the United States for an order enjoining and restraining the defendants from further proceeding to enforce and collect the assessment previously made against the shareholders of the Liberty Bank, pending the appeal in the first cause, which was granted, and from this last-named order an appeal was taken by the Comptroller of the Currency and the receiver theretofore appointed by him for the Liberty Bank, which constitutes the last named cause No. 2569, and the two will be considered in the order named.

Case No. 2558 involves a general consideration of the National Bank Act, particularly as respects the power and authority of the Comptroller of the Currency to appoint receivers for insolvent national banks, and assess shareholders in such institutions after liquidation proceedings have been inaugurated by the bank. The Liberty Bank insists that the right of the Comptroller to appoint a receiver only exists prior to the liquidation proceedings, and thereafter receivers are appointed and shareholders assessed not by the Comptroller, but by a court of equity of competent jurisdiction.

[1] Whatever may have been the law prior to the amendment of the National Bank Act of June 30, 1876, 19 Stat. 63, it would seem since that date there should be but little trouble to meet and dispose of the questions presented in this record. Section 1 of the act (Comp. St. § 9826) provides " * * * Whenever the Comptroller shall become satisfied of the insolvency of a national banking association, he may, after due examination of its affairs, * * * appoint a receiver, who shall proceed to close up such association, and enforce the personal liability of its shareholders, as provided in section fifty-two hundred and thirty-four [Rev. St. § 5234, now Comp. St. § 9821] of said statutes."

Section 2 of the act of 1876 (Comp. St. § 9807) provides that, when any national banking association shall have gone into (voluntary) liquidation under the provisions of section 5220, R. S. (Comp. St. § 9806), the individual liability of shareholders provided for by R. S. § 5151 (Comp. St. § 9689) may be enforced by any creditor, by a bill in the nature of a creditor's bill in the District Court of the district in which the association may have been located.

Section 3 of the act of 1876 (Comp. St. § 9827) provides that, when the Comptroller has appointed a receiver and shall have paid the creditors in full and redeemed the circulating notes, then a meeting of the shareholders shall be called who shall decide whether the liquidation shall be completed by the receiver or an agent appointed by the shareholders.

It will be observed that by the first section of the amended act (which it may be said in passing is one of far reaching importance to the national government and the public, and in which the Comptroller of the Currency is granted almost imperialistic powers) there is placed apparently no limitation to what he may do when the proper conditions arise for the exercise of the authority and discretion reposed in him. In a word, whenever he becomes, after due examination of its affairs, satisfied of the insolvency of a national banking association, he may appoint a receiver, who shall proceed to close up the business of such association, and enforce the personal liability against shareholders as prescribed by law. This act can have but one meaning, and having regard to the importance of its subject-matter, and the delicate duties to be per-

formed, positive and quick action, when found necessary, is contemplated looking to the winding up and closing of insolvent national banks. The convenience of large numbers of the public perhaps affected by what is to be done, and the serious disturbance of business conditions liable to be involved, would seem to justify and warrant this grant of power to an official of the dignity and importance of the Comptroller of the Currency. The third section of the amended act gives further color to this view, in that it provides that when creditors, through the Comptroller's receiver, have been paid in full, and the bank's circulating notes redeemed, the institution shall be returned to the control of its stockholders.

Conceding that the second section of the amendatory act of 1876, on which the relief sought by the Liberty Bank is largely based, may give color to the claim made, in that it provides that when a national banking association shall have gone into voluntary liquidation, the individual liability of shareholders (Rev. Stat. § 5151; Comp. St. § 9689) may be enforced by any creditor by a bill in the nature of a creditor's bill in the District Court of the district in which the association is located. But we have no such case here, and no proceedings have been instituted, or any receiver asked for, and we believe we are not called upon to pass on the relative powers and authority of the Comptroller and the courts, in an insolvency proceeding against a bank in liquidation under section 2 of the amended act. To accept the Liberty Bank's contention would be in effect to take away from the Comptroller of the Currency authority to act in the proper winding up of all insolvent national banking institutions, by the mere act or attempted act of those in charge of such institutions to inaugurate liquidation proceedings. This surely could not have been the purpose of the act, and to give it such an interpretation would not only do violence to its manifest meaning, but weaken the whole national banking system, and bring about a condition of uncertainty and chaos in connection with this most important branch of the government's business.

[2] Ample authority will be found to make clear the purposes of the National Banking Act, and to fully and clearly show the power and authority of those charged with its administration, especially that of the Comptroller of the Currency. His jurisdiction in respect to all matters properly within his discretion is exclusive, and he is in respect thereto in no manner amenable to any court, nor is his action subject to review therein.

"The bank is not considered as a private corporation, whose principal object is individual trade and individual profit; but as a public corporation, created for public and national purposes." Chief Justice Marshall, in Osborn v. United States Bank, 9 Wheat. 860, 6 L. Ed. 204.

"Our conclusions, upon principle and authority, are that Congress, having power to create a system of national banks, is the judge as to the extent of the powers which should be conferred upon such banks, and has the sole power to regulate and control the exercise of their operations; that Congress has directly dealt with the subject of insolvency of such banks by giving control to the Secretary of the Treasury and the Comptroller of the Currency, who are authorized to suspend the operations of the banks and appoint receivers thereof when they become insolvent, or when they fail to make good any impairment of capital." Mr. Justice Shiras, in Easton v. Iowa, 188 U. S. 238, 23 S. Ct. 293, 47 L. Ed. 452.

"The receiver is the instrument of the Comptroller. He is appointed by the Comptroller, and the power of appointment carries with it the power of removal. It is for the Comptroller to decide when it is necessary to institute proceedings against the stockholders to enforce their personal liability, and whether the whole or a part, and if only a part, how much, shall be collected. These questions are referred to his judgment and discretion, and his determination is conclusive. The stockholders cannot controvert it. It is not to be questioned in the litigation that may ensue. He may make it at such time as he may deem proper, and upon such data as shall be satisfactory to him." Mr. Justice Swayne in Kennedy v. Gibson, 75 U. S. (8 Wall.) 505, 19 L. Ed. 476.

[3] The decisions of the Comptroller of the Currency are not subject to collateral attack, nor is his assessment against shareholders, and the amount thereof open to review; but, on the contrary, neither the bank nor the shareholders, clearly in the absence of fraud charged and proved, are entitled to a judicial determination of any question involved in his decision either as to the solvency, the sum due creditors and the amount of assessments as ordered, such matters one and all being exclusively within the judgment and discretion of the Comptroller, and as to which he acts in a quasi judicial capacity. Kennedy v. Gibson, supra, 75 U. S. 498, 19 L. Ed. 476; Casey v. Galli, 94 U. S. 673, 24 L. Ed. 168; United States v. Knox, 102 U. S. (12 Otto) 422, 26 L. Ed. 216; Richmond v. Irons, 121

U. S. 27, 7 S. Ct. 788, 30 L. Ed. 864; Schrader v. Bank, 133 U. S. 67, 10 S. Ct. 238, 33 L. Ed. 564; Bushnell v. Leland, 164 U. S. 684, 17 S. Ct. 209, 41 L. Ed. 598; Hightower v. Bank, 263 U. S. 351, 44 S. Ct. 123, 68 L. Ed. 334; Deweese v. Smith (8th C. C. A.) 106 F. 438, 66 L. R. A. 971.

[4] Moreover, upon the Comptroller appointing a receiver of a national bank, the receiver takes possession of the assets of the bank, and assumes control of its operation, not as agent of the bank, but as an officer of the United States. He executes bond to the United States for the faithful performance of his duties, and pays to the Treasurer of the United States the moneys collected, and makes to the Comptroller under whose supervision and control he disburses the funds to the credit of the insolvent bank, a full report of his acts and doings in the premises. In re Chetwood, Pet'r, 165 U. S. 443, 458, 17 S. Ct. 385, 41 L. Ed. 782; United States v. Weitzel, 246 U. S. 533, 38 S. Ct. 381, 62 L. Ed. 872, and cases cited in each opinion.

[5] Coming to the consideration of the second case, No. 2569, it is confined within a comparatively narrow compass, and really involves the question of the right to appeal from an order refusing to grant an injunction. What court should exercise this power—that is, the court that declined the injunction, or the one to which the appeal is proposed to be taken, and what is the authority of courts acting in such circumstances? The relief asked is based upon a written motion made by the parties who failed to secure an injunction to preserve the status quo, and stay the proceedings sought to be enjoined.

Whatever the proposed action may be termed technically, at least it is but an application to grant an appeal from an order refusing an injunction, which in effect seeks to stay or enjoin the doing of something when nothing has been done. The novelty of this situation would seem to be a sufficient answer to the same, save that the statute (Judicial Code, 1911, § 129, with amendments Rose's Fed. Pro. Secs. [3d Ed.] § 612, Hopkins' Judicial Code [2d Ed.] § 129), in terms provide for such an appeal. Provision for appeals from orders refusing injunctions was apparently first made by Act Feb. 18, 1895 (28 Stat. 666). By subsequent Act of June 6, 1900 (31 Stat. 660), and a still later Act of April 14, 1906 (34 Stat. 116), the provision for appeals from orders refusing injunctions was omitted, and next appeared in Judicial Code 1911, § 129 (36 Stat. 1134 [Comp. St. § 1121]), and has remained substantially as at present, though this section has several times been amended.

Just the proper procedure for taking appeals from orders refusing to grant injunctions, and whether the same should be granted by the trial or the appellate courts, has brought about some divergence of views on the subject. In the railroad tax cases from North Carolina, the District Court sought to afford the relief granted by postponing the day on which the order declining the injunction should have effect, leaving a reasonable time to apply to the Supreme Court for an appeal, if such action should be thought proper. Southern Railway Co. and Other Railroads v. Watts et al., 259 U. S. 576, 42 S. Ct. 585, 66 L. Ed. 1071. The Supreme Court concluded that as it was a matter of which the District Court was advised, and that tribunal was not, the District Court should act upon the application. The case was proceeded with on that theory, the District Court allowing the appeal, which operated in effect to grant the injunction originally asked for, by suspending the collection of the taxes involved pending decision on the merits, and the action of the lower court was subsequently affirmed.

The precise conditions were recently before the Supreme Court in the case of Virginian Railway Co. v. United States, and United States v. Virginian Railway Co., 47 S. Ct. 222, 71 L. Ed. ——, decided December 13, 1926, and in the latter case, the District Court took the same action that it did in the North Carolina tax cases; that is, granted the appeal from an order declining an injunction. The Supreme Court quite fully reviewed the whole subject of procedure, and held that that court and the District Court alike had the right to grant or refuse the appeal, and that in the particular case it should have been refused, and not granted, especially as the effect of granting the same operated not only to secure the relief that had been denied on the application for injunction, but because it stayed the enforcement of the order of the Interstate Commerce Commission, which had received the sanction of the District Court by declining the injunction.

This decision in the Virginian Railway Cases seems conclusive of this case, as there is nothing peculiar in the circumstances here that calls for the granting of the relief sought in the circumstances. The Comptroller of the Currency had issued an order to proceed with the winding up of the affairs of the insolvent bank, by appointing a receiver and ordering the necessary assessment against the shareholders of the bank, and, the District Court having declined to enjoin this action because of the authority vested in the Comptroller, there was no reason why the court's action

and that of the Comptroller in such circumstances should be stayed.

We are not prepared to say that there may not be cases in which the stay should be had, and the appeal granted, but we assume the decision in the Virginian Railway Co. Cases to mean that at least there should be special or unusual conditions making such course proper and necessary at the stage the same was asked for here. Hence we hold that the granting of an appeal from the order refusing the injunction, in the circumstances, was an unwise exercise of the discretion reposed in the court.

Case No. 2558—Decree affirmed as to matter appealed from.

Case No. 2569—Decree reversed as to matter appealed from.