**UNITED STATES NAT. BANK OF LA GRANDE v. POLE, Comptroller of the Currency, et al.**

**No. 9302.**

District Court, D. Oregon.

Oct. 27, 1932.

J. P. Kavanaugh, of Portland, Or., for plaintiff.

Wilbur, Beckett, Howell & Oppenheimer and F. E. Marsh, all of Portland, Or., E. R. Ringo, of La Grande, Or., and C. N. Souther, of Portland, Or., for defendants.

FEE, District Judge.

This is a suit in equity brought by the United States National Bank of La Grande to restrain the Comptroller of the Currency of the United States from placing Hugh A. Bodmer as receiver in charge of the assets of the plaintiff. To the bill of complaint, the defendant filed a motion to dismiss.

The complaint is as follows, omitting the formal portions:

"On the afternoon of Saturday, the 5th of March, 1932, United States National Bank Examiners C. C. Linden and M. C. Wilde, waited upon the Board of Directors of the plaintiff, which was then in session; and said bank examiners then notified said directors

that they would not permit plaintiff to open for business on the following Monday morning, March 7, 1932, and requested said directors to take steps either for the consolidation of plaintiff bank with La Grande National Bank of La Grande, Oregon, or to join in the organization of a new national bank in said city of La Grande. Thereupon said Board of Directors passed a resolution suspending business, and directing the president and secretary to turn plaintiff bank over to said national bank examiners; and thereafter, and on the same day, said directors attended a joint meeting with the directors of La Grande National Bank and many citizens of La Grande, and said bank examiners, to consider the banking situation in La Grande, Oregon. At said joint meeting it was understood and agreed that, if plaintiff would procure sufficient waivers of deposits, a new national banking association would be organized to be located at La Grande, Oregon; that such new bank would assume all of the debts and deposit liabilities of the plaintiff, and that the plaintiff, in turn, would convey all of its assets to said new bank.

"After said joint meeting the directors of plaintiff proceeded to secure waivers from its depositors. Said waivers were signed out of the commercial accounts, savings accounts and certificates of deposit to the amount of $224,313.83. The execution and delivery of said waivers were completed on the 6th day of March, 1932, and were in an amount sufficient to satisfy said bank examiners. Thereafter additional waivers were signed and delivered which brought the total amount of waived deposits to $229,471.79. A copy of said waivers is attached hereto, marked 'A,' and made a part of this bill of complaint to the same extent as if it were extended at length herein.

"Said proposed new bank was promptly organized and is known as the First National Bank of La Grande, and on said 6th day of March, 1932, a contract between plaintiff and said new bank was drawn, the terms of which were agreed upon between the parties, and said contract was executed and delivered under date of the 7th day of March, 1932. A copy of said contract is attached hereto, marked 'B' and made a part of this bill of complaint to the same extent as if extended at length herein.

"In accordance with the terms of said contract the plaintiff, on said 7th day of March, 1932, and before said new bank opened for business, transferred and conveyed to said new bank all of its assets, and said new bank assumed and agreed to pay all of the debts and deposit liabilities of the plaintiff. Said new bank at once proceeded to pay the debts and to pay the deposit liabilities of the plaintiff in accordance with the terms and provisions of said contract, and thereafter at all times has been and is now continuing to pay such debts and deposit liabilities in due course of business.

"In taking over the assets of plaintiff said new bank divided them into two classes. The class of more liquid assets was selected by it and placed among its other assets and are being liquidated or held, and administered in the regular course of its banking business; the other class, which was regarded by said new bank as less liquid or slower assets, has been placed in a trust fund, which, with certain reserved right of substitution, will in due course be liquidated and applied by said trustee, and its co-trustee, to the payment of the waived deposits.

"The plaintiff, by appropriate corporate action, duly appointed T. J. Scroggin its liquidating agent and trustee, to dissolve and liquidate the plaintiff bank and to act with said new bank as co-trustee in administering the aforesaid trust. Said trustees took possession, and are now in possession and control of all of the assets and interests of said trust and are now administering and executing said trust in accordance with the terms and provisions of said contract between the plaintiff and said new bank.

"After the aforesaid contract between the plaintiff and said new bank was executed and delivered, said bank examiners prepared a promissory note in the sum of $50,000 payable to said new bank, and demanded that said note be signed by the plaintiff. The plaintiff's directors protested against the signing of said promissory note, but said promissory note was later executed by the officers of the plaintiff, upon the insistence of said bank examiners. Said promissory note was not executed or delivered in the ordinary course of business of the plaintiff, not authorized as *and* incident of liquidation of the plaintiff. Said promissory note was executed by the officers of plaintiff, but was not authorized or approved by the stockholders of the plaintiff.

"By virtue of the contract, waivers and transactions aforesaid, all of the debts, liabilities and obligations of the plaintiff have been settled and paid. The depositors of the plaintiff who did not sign waivers are being paid the full amount of their deposits; the depositors who signed waivers are being paid the full amount of their deposits after de-

ducting the amounts waived, and said waiver depositors voluntarily signed said waivers upon terms entirely satisfactory to them, as to final settlement and adjustment of the part of their deposits so waived; that all other debts of the plaintiff have been either paid or assumed by the new bank, and the plaintiff now owes no debts, and is not insolvent.

"The defendant J. W. Pole, as Comptroller of the Currency of the United States, has made an order purporting to appoint defendant Hugh A. Bodmer receiver of the plaintiff. It is the purpose and intention of the defendant, unless enjoined by this court, to take possession of the assets which were formerly owned by the plaintiff from the possession of said trustees and to liquidate said assets in violation of the terms of said contract, and to otherwise interfere with and prevent the said trustee from administering said trust according to the terms of said contract. That such purported seizure of assets and the liquidation thereof by a receiver will cause great expense and irreparable loss and damage to the plaintiff, to its former depositors and to its stockholders; that no reason exists for the appointment of a receiver for the plaintiff, and that the defendant, J. W. Pole, Comptroller of the Currency of the United States, has no jurisdiction, power or authority to appoint a receiver for the plaintiff.

"Said defendant, J. W. Pole, assumes to have jurisdiction, power and authority to appoint a receiver for the plaintiff in virtue of the laws of the United States relating to national banks, and in said attempted appointment he is acting under color of authority of the laws of the United States. This suit involves the construction and application of the laws of the United States relating to National Banking Associations.

"The amount of loss and damage which will result from the seizure *and* attempted assets formerly owned by the plaintiff is in excess of $3000.00."

To the complaint is attached Exhibit A, which is the form of waiver as follows:

"A

"I, the undersigned, hereby subscribe $—— out of my deposits, either on savings or checking account, in the United States National Bank of La Grande, Oregon, toward a fund to replace assets which the Comptroller of the Currency requires to be charged off to facilitate a bank consolidation, and I hereby authorize said bank to deduct said amount from my said deposits, with the understanding that such charged-off assets will be transferred to trustees, to be used:

"(1) As security to new bank for assets transferred thereto; and

"(2) As security is released by said new bank and reduced to cash, the above amount shall be paid off pro rata out of said proceeds, with all other amounts so paid, under such terms as may be approved by the National Bank Examiner."

The agreement between the two banks is made Exhibit B of the bill of complaint, as follows:

"Agreement.

"This Agreement, made and entered into this 7th day of March, 1932, by and between the United States National Bank of La Grande, as party of the first part, and the First National Bank of La Grande, as party of the second part, witnesseth that:

"Whereas, the party of the first part has been requested by the Comptroller of the Currency to charge off certain assets, and a large number of the depositors of said party of the first part have waived a part of their deposits by making contributions to a fund to replace said charged off assets, and whereas the party of the first part is selling all of its assets to the party of the second part,

"Now therefore, in consideration of the premises and of the mutual promises and agreements herein contained, the party of the first part has bargained, sold and conveyed, and does hereby bargain, sell and convey unto the party of the second part all of the assets of the party of the first part, consisting of real, personal and mixed property, bills, notes and accounts, and choses in action, and also all assets heretofore charged off and not appearing as assets of the books of the bank, and proceeds of its shares of stock in the Federal Reserve Bank of San Francisco; that the party of the second part assumes and agrees to pay all of the deposits, debts and liabilities of the party of the first part, excepting its capital stock, assessments thereon, and contributions of depositors to replace charged off assets; that the amount of the deposits of said party of the first part shall be determined by deducting the amount of contribution of each of the several subscribers from the amount shown to be due such depositor by the books of said party of the first part; that the party of the second part shall choose from the assets of the party of the first part, bills, notes, stocks, warrants and bonds and other property to the amount of the debts, deposits and liabilities of said party of the first part as above assumed; and all other property of said party of the first part shall be held in trust by said party of the

second part for the following purposes, to-wit:

"(1) The party of the second part shall have the right to substitute any note or security transferred by the party of the first part to the party of the second part for any cash or security held in such trust account, at any time prior to the thirty-first day of December, 1933; it being understood that for such period of time all property held in said trust account shall stand as security for the payment of any assets which had heretofore been transferred by the party of the first part to the party of the second part.

"(2) The property in said trust fund shall be reduced to cash as soon as possible, for reasonable prices, having due regard to business conditions, it being understood that the judgment of the trustee in making any sales or collections and settling any claims shall be conclusive in the matter.

"(3) The cash so received from the property in said fund shall be held by said trustee until released from the security to the party of the second part, then same shall be paid to the several depositors of the party of the first part who subscribed to a fund to replace said assets, pro rata according to the amount paid by each of said subscribers; and after said subscribers have been paid in full, then any overplus shall be applied to repay to the several stockholders of the first *part* any assessments they have paid upon their stock, pro rata according to the amount so paid by each of said stockholders; and after having paid said assessments in full, then the balance shall be distributed to each and all of said stockholders of the party of the first part, pro rata, in accordance with the amount of stock held by each of said stockholders. It is understood and agreed that in case the cash realized from said trust property be not sufficient to pay said subscribers, or the assessments paid by said stockholders, or the stockholders, in full, that the trustee herein shall not be liable for any deficiency.

"It is further agreed by and between the parties hereto that obligations against the party of the first part which do not appear upon the books, but hereafter appear, shall be adjusted between the parties.

"It is further agreed that at the expiration of said period ending December 31, 1933, all of such assets so held in trust shall be disposed of as ordered by the party of the first part or such liquidating agent of said party as may be in charge.

"It is further agreed that in the management of said trust assets the liquidating agent of said party of the first part shall act as a co-trustee with the party of the second part, and participate in the active management thereof, and in case the two trustees cannot agree on any question they shall appoint a third person to act with them, and the decision of the two of said three shall be final. It is further agreed that said trustees shall arrange for necessary cash advances to carry said property, to be repaid out of income or collections, as the case may be.

"In witness whereof, by authority of resolutions of their respective Boards of Directors, the parties hereto have caused these presents to be executed in their names, by the President and Cashier, and a majority of the Board of Directors of each of the parties respectively, this 7th day of March, 1932, at La Grande, Oregon."

This litigation involves nothing but the construction of portions of the National Banking Act, and the application thereof to the facts as is indicated by the following quotation from a recent case:

"The sections of the National Banking Act which have been in effect since 1876 are of controlling importance in this litigation. Section 1 of the Act [12 USCA § 191] provides: '* * * Whenever the Comptroller shall become satisfied of the insolvency of a national banking association, he may, after due examination of its affairs, * * * appoint a receiver, who shall proceed to close up such association, and enforce the personal liability of its shareholders, as provided in section five thousand two hundred thirty four (Rev. St. § 5234, now Comp. St. § 9821 [12 USCA § 192]) of said statutes.'

"Section 2 of the act of 1876 (Comp. St. § 9807 [12 USCA § 65]) provides that, when any national banking association shall have gone into (voluntary) liquidation under the provisions of section 5220, R. S. (Comp. St. § 9806 [12 USCA § 181]), the individual liability of shareholders provided for by R. S. § 5151 (Comp. St. § 9689 [12 USCA § 63]) may be enforced by any creditor, by a bill in the nature of a creditor's bill in the District Court of the district in which the association may have been located.

"Section 3 of the act of 1876 (Comp. St. § 9827 [12 USCA § 197]) provides that, when the Comptroller has appointed a receiver and shall have paid the creditors in full and redeemed the circulating notes, then a meeting of the shareholders shall be called who shall decide whether the liquidation shall be completed by the receiver or an agent appointed by the shareholders." Liberty

Nat. Bank v. McIntosh (C. C. A.) 16 F.(2d) 906, 908.

■■ The court shares the common feeling against administrative action uncontrolled by judicial review, and the thought suggests itself that a bureaucratic development of this type is not helpful, and that the powers granted are too sweeping and imperialistic. But the function of the court is to construe and not to rewrite the enactment of Congress. The representatives of the people had power to erect the system of national banking associations under the Constitution, and should be the sole arbiters of the extent of power to be conferred upon such corporations, and to circumscribe with what limitations they may see fit the privileges with which a bank founded pursuant to such statutory authority may be endowed. Unquestionably Congress contemplated the upheaval and cataclysm to which the financial structure is subject, the importance of its stability, and the necessity which exists for action unhampered by technicality in emergency.

The national banking laws confer unusual privileges and powers upon those corporations and stockholders who have chosen to act under them. Under them vast fortunes have in the past been built up. Great gifts usually carry great responsibilities. So it is with this case. But the bank unaccustomed to looking at the seamy side, although in the past it has received the benefits of the statutes, complains that their present action is arbitrary and in violation of its rights.

■■ There is no compulsion upon any group of persons to accept the benefits or disabilities of association under the National Banking Act. If any persons do so associate, each for himself, and the corporation so organized accepts all provisions of the laws whether beneficial or detrimental. The relation is consensual or contractual. The charter contract is tripartite, including the corporation, the stockholders, and the sovereign in the interest of the depositors. All the laws relating to the national banking associations are inherently a part and parcel of this contract.

Therefore if the plaintiff suffers from the act of Comptroller, and regards it as arbitrary and imperialistic, it must be remembered the bank accepted liability to such actions as one of the very conditions of its existence. The statutory sections for the ultimate protection of the depositors are founded in a sound public policy.

It is urged in the first instance that the bill constitutes a direct attack upon the action of the Comptroller in the appointment of the receiver, and the court must examine the factual basis upon which this office acted, and determine whether the foundation is sufficient.

■■ But the decisions of the courts teach us that the administrative official to whom is intrusted the rendering of discretionary determinations within a certain definite sphere, circumscribed by the will of Congress, is within the boundaries of his jurisdiction supreme. This rule is the ordinary canon governing the action of administrative tribunals, or what are referred to in less accurate language as quasi judicial officers. It has two corollaries: First, that the determinations of such bodies are not subject to collateral attack under any circumstances; and, second, that a direct attack will not avail unless founded upon error of law, fraud, or mistake.

Plaintiff, because most of the existing determinations have arisen upon collateral rather than on direct attack, has conceived that there has been a syncretism of the applicable doctrines, and that there is here an attempt to apply the rule of collateral attack to a direct proceeding.

The only two decisions involving an attempt to prevent the Comptroller from action by injunction, which have been called to the court's attention, are squarely contrary to the position of the plaintiff. Each opinion holds that where the Comptroller has acted upon a question of fact within his jurisdiction, the determination is a finality, and is not subject to review in the courts. Quotations of the pertinent portions of these opinions are as follows:

In Washington National Bank of Tacoma v. Eckels (C. C.) 57 F. 870, 871, it is said:

"In the case of the Washington National Bank against the comptroller of the currency, pending at Tacoma, I regard it as a great hardship that the comptroller of the currency should deem it necessary to interfere in the settlement of the business of the bank by the officers and means which have been chosen by the bank's stockholders, directors, and creditors, and which are satisfactory to them, especially in view of the uncontradicted averment in the bill that the bank is able to meet all of its obligations, and willing to do so, * * * and that it is proceeding as well as it can to liquidate,—that is, to pay,—and close up its business. Now, regarding it as a hardship, I have endeavored, in reflecting on the case, to bring my mind to the conclusion that the court may lawfully interfere by issuing an injunction to restrain the appoint

ment of a receiver, but the result has not been satisfactory.

"In 1876 Congress passed a law which, in terms, gives the comptroller of the currency the right to appoint a receiver whenever he becomes satisfied, after an examination, that a national bank is insolvent. The power thus vested in the comptroller of the currency is discretionary, and I think the rule holds good in this case, as in others, that where the head of a bureau in one of the departments of the government is clothed with discretionary powers, and authority to investigate facts and act upon his conclusions, his conclusions as to the facts are final, and not reviewable by the courts; so that the decision of the comptroller of the currency in this case, that the bank is insolvent, is to be taken as a finality. It is equivalent to the fact, whether the bank is really insolvent or not, so far as to authorize the exercise of the comptroller's power to put the bank in the hands of a receiver."

The recent decision of Liberty National Bank v. McIntosh (C. C. A.) 16 F.(2d) 906, 908, reaffirms this position in the following language:

"It will be observed that by the first section of the amended act (which it may be said in passing is one of far reaching importance to the national government and the public, and in which the Comptroller of the Currency is granted almost imperialistic powers) there is placed apparently no limitation to what he may do when the proper conditions arise for the exercise of the authority and discretion reposed in him. In a word, whenever he becomes, after due examination of its affairs, satisfied of the insolvency of a national banking association, he may appoint a receiver, who shall proceed to close up the business of such association, and enforce the personal liability against shareholders as prescribed by law. This act can have but one meaning, and having regard to the importance of its subject-matter, and the delicate duties to be performed, positive and quick action, when found necessary, is contemplated looking to the winding up and closing of insolvent national banks. The convenience of large numbers of the public perhaps affected by what is to be done, and the serious disturbance of business conditions liable to be involved, would seem to justify and warrant this grant of power to an official of the dignity and importance of the Comptroller of the Currency. The third section of the amended act gives further color to this view, in that it provides that when creditors, through the Comptroller's receiver, have been paid in full, and the bank's circulating notes redeemed, the institution shall be returned to the control of its stockholders. * * *

"Ample authority will be found to make clear the purposes of the National Banking Act, and to fully and clearly show the power and authority of those charged with its administration, especially that of the Comptroller of the Currency. His jurisdiction in respect to all matters properly within his discretion is exclusive, and he is in respect thereto in no manner amenable to any court, nor is his action subject to review therein."

■ Although the second decision was rendered by a Court of Appeals of a different circuit from this, it is highly persuasive, even though not absolutely binding upon this tribunal. The plaintiff does not cite any cases to the contrary, nor does it attempt to distinguish these cases on the facts.

There are many tribunals in the federal system, moreover, which make factual determinations uncontrolled by the courts when the finding is within the jurisdictional boundaries and untainted by fraud. Chief among these must be mentioned the Land Department in the disposal of the public lands. The theory is that the character of the determination of these questions is such that it must be done in a forum released from judicial control by the circumstances of the case.

Likewise, since the protection of the public and the depositors is required, and the circumstances of emergency are such that there is often not time for court action without precipitating a catastrophe, the Legislative Department has seen fit to set the Comptroller over national banks and, in the statute which creates such associations, circumscribe the conditions of existence.

But it is urged that the facts set forth in the complaint are sufficient showing to bring the cause within the rule of error of law, fraud, or mistake.

■ Plaintiff definitely disclaims a pleading of fraud, although it is said that inference might be raised upon the facts stated. But if it were intended to allege fraud the specification thereof should be exact and definite.

■ The complaint contains the words "the plaintiff now owes no debts and is not insolvent," and the plaintiff claims this allegation has been admitted by the demurrer. These words are the statement of conclusions, not of facts. The previous portions of the pleading contain the facts. On March 5, 1932, the bank examiner refused to permit the plaintiff to reopen upon the next business day, and

pursuant to a waiver of certain of the deposits, the plaintiff transferred its assets to the new bank, which assumed and agreed to pay all of the deposits, debts, and liabilities of the plaintiff, except its capital stock, assessments thereof, and contributions of depositors to replace charged-off assets. No fact is pleaded which shows that the plaintiff was thereby relieved of the obligations which the new bank agreed to pay. It clearly appears from the pleadings that these obligations have not yet been paid. It is said "the depositors of the plaintiff who did not sign waivers *are being* paid; * * * that all of the debts of the plaintiff have been either paid *or assumed* by the new bank." It is doctrine entirely new to the law that a debt assumed by a third party but not paid, without more, relieves the original debtor of responsibility.

But even upon this basis the pleading does not meet the precise wording of the statute. The act does not give to the Comptroller power to act and to close the bank and take charge of it when it is insolvent. If Congress had so declared, then the action of the Comptroller would have to be based upon two facts, a mistake or error of law as to either of which might have been fatal; that is, the bank must have been a national bank, and, secondly, it must have been insolvent. Plaintiff attempts to meet such a situation. But the language in the enactment is, "Whenever the comptroller [of the currency] shall become satisfied of the insolvency of a national banking association, he may * * * appoint a receiver." (12 USCA § 191).

In other words, the jurisdictional fact in issue is not whether the bank was or was not actually insolvent, but the state of mind of the Comptroller. A familiar example of an analogous clause is that contained in a chattel mortgage which permits a mortgagee to accelerate the debt and commence foreclosure, "if he shall deem the security insufficient." Then the fact to be proved is not the sufficiency of the security, but the state of mind of the mortgagee.

So far as the note for $50,000 is concerned, there is nothing alleged from which it can be inferred that it is not an obligation of the old bank. It was signed by the officers, and so far as the pleading shows was one of the assets for which the new bank promised to pay the obligations of the old. There is no allegation that there was no consideration for the note. It is not pleaded that this note was not received by the new bank as part consideration for the transfer, and to protect itself against the depositors. It is the implication of the pleading, and it is urged that this is a debt contracted during the liquidation, for which the stockholders are not liable.

But this question is disposed of in an opinion rendered by the Circuit Court of Appeals of the Ninth Circuit. In Chase v. Hall, 30 F.(2d) 195, 197, an action had been brought by a receiver appointed by the Comptroller of the Currency for a first National Bank deemed insolvent, to collect an assessment, made to pay a note in favor of the Dinuba National Bank, which had assumed the deposit liabilities of the First National. It appeared the only liability of the old bank was this note. The court say: "The appellants contend that they are not liable for the assessment for the reason that the debt in the instant case was not incurred in the ordinary course of business or in the ordinary course of liquidation. We cannot agree that the execution of the note was out of the ordinary course of liquidation. It has been held that when a national bank assumes the debts of an insolvent bank in consideration of a transfer of a portion of its assets and a note for the balance, the note represents the contracts, debts, and engagements of the insolvent bank for which its stockholders are responsible."

The court further, in discussing Schradea v. Manufacturers' Nat. Bank, 133 U. S. 67, 10 S. Ct. 238, 33 L. Ed. 564, say: "We find nothing in the decision which tends to show that the debt in the case at bar belongs to an excepted class or was out of the ordinary course of liquidation. The $200,000 note represented the obligation of the liquidating bank to its depositors. It was not a creation of a new liability and it added nothing to the existing obligation of the shareholders."

The allegation that the examiner required the signing of the note after the contract was executed and delivered, adds nothing to the statement. It may for all that have been part of the consideration for the assumption of the debts and obligations. Nor has the case anything in common with Moss v. Whitzel (C. C.) 108 F. 579, 580, where fraud was alleged.

The fact that voluntary liquidation has been commenced and gone on for some time will not prevent the Comptroller from exercising the functions prescribed by the statute. If such were the case, banks which found matters tightening up would go into voluntary liquidation, sell the assets, and relieve their

stockholders of liability. The plaintiff still remains a national banking association subject to all the statutory powers of the Comptroller.

Upon this feature Washington National Bank v. Eckels, supra, is enlightening. The court says: "Section 5220, Rev. St. [12 USCA § 181], gives the stockholders the right, by a two-thirds vote, to put the bank in voluntary liquidation. But there the law, so far as it gives the stockholders or officers of the bank any rights, ceases. It simply declares that they may, by vote, go into voluntary liquidation, and then the duty devolves upon them to give certain notices,—give notice to the comptroller, and give notice to everybody by publication. But I am unable to find in that provision anything to control this later act of congress, vesting the comptroller with power to appoint a receiver to take charge of a national bank when he becomes satisfied that it is insolvent. The same statute of 1876 provides when the stockholders may choose an agent to take charge of the business of a bank in liquidation; that is, after the receiver has had charge of it long enough to pay all its debts, and after its debts have all been paid, then the stockholders can select an agent to take charge of what remains of the assets. Now, all that seems to indicate that the comptroller, as the head of the bureau having charge of the national banks of the United States, and representing the government, so far as it has any interest, and representing the creditors and stockholders, is vested with power to take charge of a bank, and appoint a receiver, whenever certain conditions exist, and I do not think that this power is limited to cases in which his action may be taken before the bank has ceased to do a banking business. The words 'close up,' used in the statute, mean the liquidation and closing up of the business of the bank, not the closing of the bank. It is evident from the manner in which these words are used that it relates to the final winding up of the business. All that the receiver is required to do, the only service he can render, is in transacting the business that has to be done after the bank is closed, and it certainly never was intended by the use of these words to indicate an intention to limit the power of the comptroller to taking action before the bank has closed its doors. These are my conclusions in the matter, and I shall therefore sustain the plea."

 Upon every feature, therefore, the complaint is met by decisions contrary to the contentions now made.

The motion to dismiss is sustained.