## BRYCE v. NATIONAL CITY BANK OF NEW ROCHELLE et al. (two cases).

District Court, S. D. New York.
Nov. 6, 1936.
As Amended on Rehearing Feb. 2, 1937.

Westall, Stohldreier & Barrett, of White Plains, N. Y. (Henry E. Stohldreier, and Walter W. Westall, both of White Plains, N. Y., of counsel), for plaintiff.

Dunlap, Otto & McGovern, of New Rochelle, N. Y. (Walter G. C. Otto and J. Raymond McGovern, both of New Rochelle, N. Y., of counsel), for defendants.

WOOLSEY, District Judge.

My judgment in these causes is that the complaints be dismissed without costs.

I. The plaintiff's quest in these causes is for property to satisfy a judgment on an award of arbitrators entered in his favor on June 21, 1933, in the New York Supreme Court of Westchester county against the Bræmoor Corporation.

II. The National City Bank of New Rochelle, now in the hands of a receiver appointed by the Comptroller of the Currency—hereinafter referred to as the bank—is a corporation formed under the National Banking Act, with its principal office in New Rochelle, in the county of Westchester, N. Y.

Both the bank and its receiver are joined in these causes as defendants with Bræmoor Corporation, the judgment debtor.

III. On March 4, 1933, the bank closed and has never reopened.

On March 21, 1933, the Comptroller of the Currency appointed Rennie, then president of the bank, the conservator thereof.

On August 4, 1933, at the request of Rennie, the Comptroller appointed Loughman as conservator of the bank to succeed Rennie.

On February 1, 1934, the Comptroller appointed Loughman as receiver of the bank.

The Bræmoor Corporation—hereinafter referred to as Bræmoor—is a New York corporation, formed under the Business Corporations Law of New York State (Consol.Laws, c. 4), on March 30, 1932, to be used by the bank as its nominee or agent in matters with which it could not or did not wish to deal direct. The stock of Bræmoor was all owned by the bank. Its officers were bank employees who were paid by the bank, and it was in effect an appendage of the trust department of the bank. But, although wholly controlled by the bank, it was a separate legal entity—as has already been decided by the New York Supreme Court for Westchester county.

IV. The events which led to the plaintiff's securing judgment against Bræmoor are, of course, merged therein, but, in order to clarify the situation, it is necessary to consider them briefly and also certain other facts which are common to the two causes on trial.

On or about March 17, 1930, the White Plains Daily Corporation gave to the bank a bond for $80,000, and as security therefor a mortgage on its land at 107 Mamaroneck avenue, White Plains. On February 17, 1932, an additional bond and mortgage for $10,000 was given by it to the bank. These two mortgages were duly consolidated as a single first mortgage of $90,000 on the same date.

By December, 1932, the White Plains Daily Corporation was in default under this mortgage, and had filed a petition in bankruptcy in this court.

The bank was desirous of getting as much salvage as it could out of the situation, and, being under the impression that the building at 107 Mamaroneck avenue was peculiarly adapted to newspaper uses, entered into conversations, on or about December 30, 1932, with the plaintiff Bryce looking to his taking over the property and operating it as a newspaper plant.

Some time early in February, 1933, it was explained to Bryce that, as it was a national bank, the bank could not buy or own stock in a newspaper plant, but that the contract with him could only be made with its subsidiary Bræmoor. This was the first time Bryce had heard of Bræmoor. But before the contract was signed I find that he thoroughly understood that the bank was not and could not be a party to it. He, therefore, went into this newspaper venture trusting to Bræmoor's credit only, and knowing that Bræmoor only was legally responsible to him, though he knew that the whole matter was being fostered by the bank.

On February 28, 1933, a contract was entered into between Bryce and Bræmoor which, so far as here important, recited, inter alia, that Bræmoor had agreed to try to acquire title to the real property, machinery, etc., of the White Plains Daily Corporation of 107 Mamaroneck avenue, White Plains, then in bankruptcy, and then to give a lease of the property to a new corporation which was to be organized by Bryce, and that the preferred capital stock thereof was to be subscribed for jointly by Bryce and Bræmoor.

Bræmoor agreed, so far as here relevant, that it would use its best endeavors (1) to secure title to the real and personal property of the White Plains Daily Corporation provided it did not have to bid any amount in excess of the mortgages thereon; (2) to secure an agreement from the bank as holder of the first mortgage consenting to lease of the premises to the new corporation as tenant, and an agreement from the bank not to foreclose the mortgage during the term of the lease so long as the tenant should not be in default

under the terms thereof; (3) to sell to the new corporation the office furniture and equipment for .5 shares of preferred stock and .500 shares of the common capital stock; and. (4) to subscribe for 50 shares of the preferred stock at $100 per share.

Bryce agreed (1) to organize, under the laws of the state of New York, a new corporation to be known as the Westchester Social .& Shopping News, Inc., with a capital stock of 250 shares of the par value of $100 each, of 7 per cent. cumulative nonvoting preferred stock, and 500 shares of no par value common stock; (2) to allow Bræmoor to have two directors in the new corporation; (3) to cause the new corporation to sign the lease above mentioned, a copy of which was annexed to the agreement.

It was agreed by both parties, inter alia, that they would arbitrate, under the provisions of the Arbitration Law of the State of New York (Consol.Laws, c. 72), any and all disputes or controversies of any sort which might arise under the agreement.

On March 17, 1933, the referee in bankruptcy having charge in Westchester County authorized the sale of the property of the White Plains Daily Corporation to Bræmoor.

On March 24, 1933, a deed by the Irving Trust Company, as its trustee in bankruptcy, conveyed title thereof to Bræmoor by deed providing that it was subject to the outstanding first mortgage lien of $90,000 held by the bank. Through some error the deed was not delivered that same day, and when later delivered it was not recorded by Bræmoor.

V. Bryce performed his part of the contract.

On March 1st the bank wrote the plaintiff a letter which reads as follows:

"We wish to advise you that Bræmoor Corporation is a wholly owned subsidiary of The National City Bank of New Rochelle, having been formed for the purpose of acting as nominee for the bank in such cases as it may be deemed necessary. The various directors and officers are employees of the bank and hold their office at the pleasure of the bank.

"In connection with a certain agreement dated February 28, 1933 between Bræmoor Corporation and yourself, Frank W. Bryce, this bank hereby agrees to the terms and conditions as outlined in the said agreement."

This letter confirmed the information which had already been given to Bryce, and it also may be fairly construed as a compliance with Bræmoor's undertaking in the contract to secure the consent of the bank to a lease and an agreement from the bank not to foreclose the mortgage whilst the new tenant was living up to the terms of the lease. I find that Bryce so understood the letter.

That was the only one of its obligations under the contract which Bræmoor wholly performed, for, although the Mamaroneck avenue property was deeded to it on March 24, 1933, it kept postponing signing the lease to the new corporation which Bryce had formed and also failed to pay more than $1,500 of the $5,000 which it had agreed to contribute to the capital stock thereof.

Between mid-March, 1933, and June 15, 1933, there were various conferences about the situation between Rennie, who up to March 21st was the president of the bank and thereafter until August 4, 1933, its first conservator. Bryce claims that relying on statements at those conferences that Bræmoor had sufficient assets to perform its part of the contract, he continued until June 15, 1933, with the performance of his part of the contract which he would not have done except for those statements.

On June 15, 1933, however, as Bræmoor had not up to that time paid in its full contribution of $5,000. to the capital stock of the new corporation and was still refusing to sign the lease which it had promised to make, Bryce declared a breach of the contract on the part of Bræmoor, and stopped publication of his newspaper which he had begun on April 12, 1933. That ended all performance of the contract.

The evidence is slightly uncertain as to just when Bryce focused his claim for damages, but certainly it was not until the middle of August, 1933, that he demanded an arbitration.

On June 20, 1934, the arbitrators made an award allowing Bryce the sum of $20,-000 damages for breach of contract. Various mesne proceedings were had in the arbitration matter including an appeal to the Appellate Division, Second Department (Bræmoor Corp. v. Bryce, 244 App. Div. 801, 279 N.Y.S. 444), with the result

that the entry of a judgment on the award was not made until June 21, 1935.

This, I believe, is an adequate summary of the background of the contentions made by Bryce in these causes and we can now turn to the separate causes of action in which he seeks to set aside transfers of the property by Bræmoor to the bank.

VI. A. Action No. 1: On December 30, 1931, one Nick Lanni gave a bond and mortgage to the First Mortgage Guaranty & Title Company in the sum of $18,000.

On March 21, 1932, this was assigned to the bank for $18,000.

By January 10, 1932, when financial matters throughout the land were in what may fairly be described as a somewhat tremulous condition, this mortgage was in default and on that date, the bank, not desiring to appear directly in the matter, assigned it to Bræmoor for a consideration stated as $1 in order that Bræmoor as its nominee might bring foreclosure proceedings.

On January 19, 1933, Bræmoor commenced foreclosure proceedings.

On March 31, 1933, there was a decree of foreclosure and order of sale.

On May 23, 1933, there was a sale of the property to Bræmoor for the sum of $1,095. This amount was apparently arrived at in order to cover the foreclosure expenses and was paid by the bank.

On July 11, 1933, the following events occurred in pursuance of the bank's instructions to Bræmoor as its nominee:

Bræmoor received the foreclosure deed and then, in pursuance of a previously made contract with one Micou, sold the property to him for $2,000 cash and a purchase-money mortgage in the sum of $18,-000, and, at the same time, assigned the purchase-money mortgage to the bank without receiving any consideration therefor.

Bræmoor never paid anything except the nominal consideration of $1 in connection with the assignment of the Lanni mortgage to it and held title (1) to the mortgage; (2) after foreclosure, to the property covered by the mortgage; and (3) to the proceeds of the sale of said property—cash and purchase-money mortgage—solely as a fiduciary for the bank, which was always in a position to compel Bræmoor to act in regard thereto as it might be instructed.

B. Action No. 2: In March, 1929, one Frank J. Brucker owned property at 68 Congress street, White Plains.

On March 30, 1929, Brucker made a bond and mortgage to the bank for the sum of $6,000 on 68 Congress street, White Plains. This became due March 30, 1932, and in December, 1932, being unable to deal with the situation, and in order to avoid foreclosure, Brucker and his wife, by a deed which recited that the transfer was subject to the bank's mortgage, transferred his property to Bræmoor as the nominee of the bank. Bræmoor never paid a cent for this property, and, obviously, it held the property for the bank in a fiduciary capacity.

On July 1, 1933, Bræmoor assigned the rents of this property to the bank. This assignment of rents gave to the assignee the right to apply any sum realized therefrom to the payment of taxes or the payment of interest, and also to the costs and disbursements of any foreclosure proceedings that might be necessary.

There was a judgment lien against this land held by the Huguenot Trust Company, and on April 4, 1935, in order to clean up the situation and get an unclouded title thereto, the bank began a foreclosure proceeding.

The contention of the plaintiff in this cause is that the foreclosure was collusive because at the time when the proceeding in foreclosure was commenced the bank had enough money collected under the above-mentioned assignment, from the rents of the property to pay up all arrears due on the mortgage but elected to credit the money against an indebtedness then due from Bræmoor to the bank. Hence it is argued the procedure followed by the bank was adopted to secure the Congress street property in fraud of Bræmoor's creditors.

On June 4, 1935, there was a judgment of foreclosure, and sale and, on June 9, 1935, there was a foreclosure sale and a deed delivered to the bank which is now the owner in fee of the Brucker property.

VII. The Debtor and Creditor Law (Consol.Laws, c. 12) § 270, under the heading "Definition of terms," defines "assets" thus: "In this article 'assets' of a debtor means property not exempt from liability for his debts. To the extent that any property is liable for any debts of the debtor, such property shall be included in his assets."

When Bræmoor held the Lanni mortgage in its original form and its proceeds through all their transmutations between January 10, 1932, and July 11, 1933, it was solely as a fiduciary nominee for the bank. This also is true of the legal title to the Brucker property which Bræmoor held from December, 1932, to June 9, 1935, when it was conveyed to the bank.

In Ewart on Estoppel, at page 25, the author says:

"Usually a creditor can seize such estates only as his debtor in reality owns; and if the debtor be a trustee, his creditors are not commonly entitled to levy upon the trust estate." Citing Re General Horticultural Company, L.R. 32 Ch.Div. 512; Badeley v. Consolidated, L.R. 38 Ch. Div. 238; Root v. French, 13 Wend.(N.Y.) 570, 28 Am.Dec. 482; Bryant v. Whitcher, 52 N.H. 158.

Under the circumstances herein shown, therefore, in the absence of an estoppel on the bank's assertion of its equitable title to the particular properties here involved, judgment creditors of Bræmoor could by proper proceedings have been prevented by the bank from levying on those properties as assets of Bræmoor even whilst the title to them was in Bræmoor; and, consequently, those properties could never properly have been regarded as assets of Bræmoor within the statutory definition above quoted.

In order that a transfer may be actionable as in fraud of creditors, it is necessary that the assets of the transferor be depleted. Any transfer which does not deplete his assets cannot amount to more vis-à-vis the creditors of the transferor than an injuria absque damno. Willcox v. Goess, 16 F.Supp. 350, decided by this court on June 24, 1936. And cf. Glenn on Fraudulent Conveyances, §§ 195 and 199; Stolz v. Ginsburg, 217 App.Div. 701, 215 N.Y.S. 927, affirmed 245 N.Y. 519, 157 N. E. 841; In re Fred Stern & Co., Inc. (C. C.A.2) 54 F.(2d) 478, 480.

Bræmoor, in making the transfers to the bank, at the bank's request, was acting in pursuance of its fiduciary duty to the bank in respect of what was in the eyes of equity the bank's property and the transfers, by whatever means accomplished, did not deplete Bræmoor's assets in any way, and so it becomes unnecessary to discuss the financial situation of Bræmoor.

VIII. Counsel for Bryce ingeniously attempts to meet the situation with which he finds himself faced herein by claiming that —owing to the alleged representations made on several occasions to Bryce by Rennie between March 15, 1933, and June 15, 1933, to the effect that Bræmoor had sufficient assets to perform its part of the contract— the bank, which has now received and holds title to the pieces of property involved in these two causes, cannot in equity retain them because when transferred the two pieces of property were what (to epitomize this argument) might aptly be called estoppel assets of Bræmoor which Bryce can now follow into the hands of the bank as having been transferred to the bank by Bræmoor in fraud of Bryce as its creditor.

A. The contract between Bryce and Bræmoor was made on February 28, 1933, and, consequently, all the representations on which the plaintiff claims his estoppel occurred after the contract was made and whilst Bryce was engaged in performing the obligations which he had assumed and Bræmoor was postponing the performance of its obligations thereunder.

Thus we have a case—for which, although they have been diligent, counsel have been unable to find a parallel—wherein Bryce having a contract with Bræmoor, claims an estoppel against the bank, a third party outside the contract, on the ground that Bryce continued performance of his obligations thereunder instead of declaring a breach, because he was induced by the bank to believe that Bræmoor, the other party to the contract, was in a position financially to perform its part thereof.

I do not see that there is any inherent objection to finding an estoppel under these circumstances, for the fact that the representations induced inaction—i. e., plaintiff's not earlier claiming damages by way of arbitration under his contract—would not prevent an estoppel for reasons felicitously stated by Mr. Justice Proskauer in Continental Insurance Company v. Mercadante, 222 App.Div. 181, 184, 187, 225 N.Y.S. 488.

But the plaintiff's case fails by reason of the fact that Rennie, neither as president of the closed bank or later as conservator thereof, had any authority, actual or implied, to add in any way to the obligations of the bank whose assets for distribution among creditors were fixed as of March 4, 1933.

B. In order to make the situation clear, I have to recapitulate some of the important dates which are common ground:

On March 4, 1933, the bank closed and has never reopened and is now in liquidation through Edward D. Loughman, its receiver and one of the defendants herein.

On March 21, 1933, the Comptroller of the Currency appointed Rennie, until then president of the bank, as conservator thereof.

On August 4, 1933, at the request of Rennie, the Comptroller of the Currency appointed Loughman as conservator of the bank in succession to Rennie.

On February 1, 1934, the Comptroller of the Currency appointed Loughman as receiver of the bank.

It is the plaintiff's case, as observed above, that all the representations on which he relies for his estoppel in respect of the two pieces of property mentioned in these causes occurred between March 15, 1933, and June 15, 1933, at which time the bank was closed. During this period which covers the alleged representations Rennie was president of the bank—between March 15 and March 21, 1933—and conservator thereafter.

C. The first question to determine, therefore, is whether any representations which Rennie might have made either as president of the closed bank or conservator thereof could be deemed to be binding on the assets of the bank now in a receiver's hands for liquidation.

The closing of the bank on Saturday, March 4, 1933, as above stated, was in pursuance of a Proclamation for a Bank Moratorium made by the Governor of the State of New York and dated March 3, 1933.

The bank remained closed—at first in pursuance of Proclamations for a Bank Moratorium, dated March 6, 1933, No. 2039 (12 U.S.C.A. § 95 note), and made by the President of the United States under the Act of October 6, 1917, § 5 (b) as amended, and § 16 (50 U.S.C.A. Appendix §§ 5 (b), 16), and by the Governor of the State of New York, respectively—and subsequently in pursuance of a Proclamation by the President of the United States, dated March 9, 1933 (12 U.S.C.A. § 95 note), and an Executive Order of the President of the United States, dated March 10, 1933, No. 6073 (see 12 U.S.C.A. § 95 note), both made in pursuance of section 4 of the Act of Congress of March 9, 1933 (12 U.S.C.A. § 95), which act also confirmed and ratified all Proclamations issued by the President of the United States under the authority of the Act of October 6, 1917, above mentioned.

It is common ground that the bank has never reopened, or exercised its banking functions in any way, although by Executive Order of March 10, 1933, the Secretary of the Treasury was authorized and empowered to make such regulations as he might prescribe permitting any solvent member bank of the Federal Reserve System and any other solvent banking institutions organized under the laws of the United States to perform any or all of their usual banking functions except such functions as were therein prohibited.

D. The record shows that the reason why Bryce was solicitous in regard to the performance by Bræmoor of its part of the contract was because the bank was closed and he dealt with Rennie knowing that he was the president of a closed bank.

It seems to me clear that any authority, whether express or implied, which Rennie had as president of the bank, was sterilized after the bank was closed, and consequently Rennie could not bind the assets of the bank in any respect between the time when the bank was closed and his appointment as conservator, except, perhaps, in a kind of residual sense, that is, if and when the bank reopened; but as the bank never reopened but here we do not have to consider what would have happened in that case.

As the manner now stands, it is perfectly clear that the estoppel, which the plaintiff claims, must fail by reason of the fact that there was not any authority in the persons who are stated to have made the representations, on which the estoppel is based, to bind the bank by anything which they may have said in respect of Bræmoor's assets or otherwise.

For to adopt the plaintiff's theory of the case would be to load the bank's assets with a claim which arose after the bank was closed and make the plaintiff a preferred creditor in respect of that claim with a status prior to the depositors of the bank and the other general creditors thereof who had claims, liquidated or liquidatable, as of March 4, 1933, which was the official date of the closing of the bank, under the principles established by the Comptroller of the Currency in his Circular CR–7, dated June 9, 1933. In that circular he laid down certain rules governing the determination of the date of the official closing of a nation-

al bank and the time at which the rights of creditors thereof were to become fixed for the purposes of their liquidation.

Inter alia, the said circular provided that:

"1. Where prior to the Presidential proclamation a banking holiday Proclamation or Act was issued by the State in which the subject bank is located, and the bank immediately thereafter closed in pursuance of such State Proclamation or Act, such date of closing should be taken as the official date of closing, assuming such bank thereafter remained closed."

"5. The date of appointment of a conservator or receiver (as the case may be), for a bank which was, at the time of such appointment already closed under the Presidential Proclamation of March 6, 1933, or under a State Proclamation, is not to be taken as the official closing date of the bank, inasmuch as the conservator or receiver was not appointed until subsequent to the actual closing of the bank. * * *"

"8. The official date of closing of a bank having been fixed in accordance with the foregoing instructions, it follows that as a general rule (subject to exceptions indicated in specific instructions from time to time issued), the rights of all depositors and creditors of a bank are fixed or 'frozen' as of the official date of closing of such bank. Consequently, the calculation and allowance of,—the claims of general depositors or creditors, of set-offs, and of interest upon interest-bearing deposits or obligations payable by the bank and constituting general claims only, are to be made as of, or retroactive to, the official date of closing of such bank."

■ As to such matters of administration which are left to the discretion of the Comptroller of the Currency, his powers are plenary and not subject to court review. Cf. Liberty National Bank v. McIntosh, Comptroller of the Currency, et al., 16 F.(2d) 906, 909 (C.C.A.4).

■ E. It seems to me that the cases amply support the thesis that between the official closing of a bank and the appointment of a conservator or receiver thereof additional liabilities may not be imposed on the bank's assets.

The nearest case to the instant causes which I have been able to find is Daly Bros., Inc., v. Hickman, 61 Washington Law Reporter, 802, decided November 4, 1933, by Mr. Justice Letts, of what was then known as the Supreme Court of the District of Columbia.

The facts in that case were as follows: The plaintiff was the holder of a certificate of deposit amounting to $25,896.50 in the Franklin National Bank in Washington, D. C. On February 28, 1933, he requested that bank to purchase for him $25,000 of Liberty bonds and in payment therefor indorsed and delivered to the Franklin National Bank the certificate of deposit just referred to. Arrangements were made by the bank for the purchase of the Liberty bonds from the Chase National Bank of the City of New York, and a credit was established by the Franklin Bank in the Chase Bank on March 2, 1933, in the sum of $25,000, but it was not until March 13, 1933, that the Chase Bank executed the purchase order and charged the account of the Franklin Bank. On March 14, 1933, the Franklin Bank received the bonds; later in the same day a conservator was appointed. The plaintiff in that suit asserted that the transaction of purchase which was completed prior to the appointment of the conservator vested in him title to the bonds.

The Franklin Bank was closed by presidential proclamation on March 6, 1933, and remained closed pursuant to the supplemental proclamation of March 9, 1933. A conservator for it was appointed March 14, 1933. The court held that the rights of general creditors became fixed as on March 6, 1933, the date of the official closing of the bank, and not as of the date of the appointment of the conservator. In that case it was said by Mr. Justice Letts in the course of a carefully considered opinion dismissing the complaint: "It was the purpose of the President's proclamation to preserve the condition of the Bank as it was on March 6, 1933, and the appointment of the Conservator on March 14, 1933 was merely an administrative act on the part of the Comptroller of the Currency to place in charge of the Bank a representative of the Treasury Department; but the bank was officially closed on March 6, 1933, and from that date no transaction could be regarded as lawful except in recognition of the rights of the general creditors which became fixed as of that date."

The same principle is implicit in the following cases: United States Fidelity & Guaranty Company v. Wooldridge, 268 U.S. 234, 237, 238, 45 S.Ct. 489, 69 L.Ed. 932, 40 A.L.R. 1094, affirming 295 F. 847 (C.C.A. 5); Yardley v. Philler, 167 U.S. 344, 360,

17 S.Ct. 835, 42 L.Ed. 192; Davis v. Elmira Savings Bank, 161 U.S. 275, 290, 16 S.Ct. 502, 40 L.Ed. 700; Scott v. Armstrong, 146 U.S. 499, 511, 13 S.Ct. 148, 36 L.Ed. 1059; McCandless v. Dyar (D.C.) 34 F.(2d) 989, 991; Hudson Company v. Thomas (D.C.) 6 F.Supp. 857, 859.

After Rennie was appointed conservator of the bank, the situation was not changed in any respect.

The conservator of a bank cannot, of course, make representations which would give a new claim against its assets or a preference to one creditor over other creditors as the plaintiff would, in effect, have me do. The purpose of the appointment of a conservator is to hold matters in statu quo pending a receivership or some change in the situation which may allow the bank to reopen and to resume its banking activities.

Consequently the representations made by Rennie, both as president of the bank and as conservator thereof, were without any legal effect whatever because of his lack of authority in either capacity after the bank was officially closed to bind the bank's assets or to create any obligation against those assets by contract, estoppel or otherwise.

Therefore, it is unnecessary for me to discuss the other interesting questions raised by the plaintiff with regard to the possibility of getting an estoppel under the circumstances of these causes and the effect of such estoppel if it could have been procured.

F. I do not think, in spite of the fact that the plaintiff has been unable to collect his judgment, that he has any real grievance because from a time before the contract was made he knew that legally he would have to trust to Bræmoor's credit alone in respect of the performance thereof. Now, having secured a judgment against Bræmoor which he finds is valueless, he has not any justification in complaining because he cannot subject the assets of the bank to a liability for Bræmoor's debts solely on the ground of conversations with Rennie after the bank was closed and the plaintiff became uneasy as to his situation in respect of his contract with Bræmoor.

IX. This opinion may stand as the findings of fact and conclusions of law required under Equity Rule 70½ (28 U.S.C.A. following section 723), and I will sign an order so providing. Hazeltine Corporation v. Radio Corporation (D.C.) 52 F.(2d) 504, 512; Lewys v. O'Neill (D.C.)

49 F.(2d) 603, 618; Briggs v. United States (C.C.A.2) 45 F.(2d) 479, 480; Stelos Company v. Hosiery Motor-Mend Corporation (D.C.) 60 F.(2d) 1009, 1013; Id. (C.C.A.2) 72 F.(2d) 405; Id., 295 U.S. 237, 55 S.Ct. 746, 79 L.Ed. 1414; Cf. also El Sol (D.C.) 45 F.(2d) 852, 856, 857; Southern Pac. Co. v. U.S. (C.C.A.2) 72 F.(2d) 212.

An order to this effect must be embodied in each of the final decrees dismissing the complaints without costs, which may be presented to me by the defendants for signature on three days' notice.