**In re Paul VALENTE, Debtor.**

No. 94–10176.

United States Bankruptcy Court,
D. Rhode Island.

June 26, 2001.

Louis A. Geremia, Lisa A. Geremia, Geremia & Demarco, Ltd., Providence, RI, for Debtor.

Thomas S. Hemmendinger, Brennan, Recupero, Cascione, Scungio & McAllister,

LLP, Providence, RI, for Fleet National Bank.

David B. Hathaway, Warwick, RI, Chapter 7 Trustee.

### DECISION AND ORDER

ARTHUR N. VOTOLATO, Bankruptcy Judge.

Heard on the Motion of Fleet National Bank ("Fleet") for turnover of $18,000 held in escrow by Samuel Miller, Esq., the closing attorney for First Federal Savings Bank of America ("First Federal"). The Debtor objects, claiming that the funds belong to him. The parties have elected not to call witnesses, notwithstanding my plainly expressed concern over deciding this matter without live testimony. Instead, they have presented 36 Exhibits, and Memoranda of Law. At issue is whether the Debtor retained an equitable interest when he conveyed real estate to his son, for no consideration, on June 30, 1992. For the reasons set forth below, I find that Fleet has not met its burden on the issue, and deny its request for relief.[1]

### BACKGROUND

In 1985, Paul Valente purchased 774 Jepson Lane, Middletown, Rhode Island (hereinafter the "Property"). Four years later, Fleet loaned him $180,000, secured by a mortgage on other property owned by Valente in Newport, Rhode Island. Thereafter, Valente defaulted as to the Newport property, and Fleet foreclosed, incurring a deficiency after the sale. In June 1992, Valente transferred the Jepson Lane Property to his son Robert, for no consideration, for the stated purpose of "estate planning." *See* Joint Pre–Trial Order, Docket No. 32, p. 2, ¶ 11. On July 26, 1993, Fleet obtained judgment against Valente in the amount of $10,648, its deficiency after foreclosure of the Newport property, and on September 9, 1993, Fleet attempted to levy upon the Jepson Lane Property by filing a copy of the execution in the land evidence records for the Town of Middletown.

When Paul Valente conveyed Jepson Lane in June 1992 to his son Robert, he was insolvent, owing approximately $140,000 to the Internal Revenue Service and the Rhode Island Division of Taxation, and generally was not paying his debts as they became due. After the conveyance, Valente continued to occupy the Property, and on January 28, 1994, he filed a voluntary Chapter 7 petition. The Chapter 7 Trustee filed a report of no distribution, on April 21, 1994, Valente received his discharge, and the case was closed on April 29, 1994.

After bankruptcy, Valente continued to occupy the Property until September 1997, when he leased the premises to one James J. Cunha. Valente's son Robert (the record owner) had no contact with the lessee, did not sign the lease, received none of the rents, and paid none of the expenses. Paul Valente received the rent payments, and really behaved as the owner in all respects. On April 14, 1999, Robert executed a deed re-conveying the Property to his father, for no consideration. Adding insult to this already blatant charade, Paul Valente, as grantee, notarized the grantor's signature on the deed. In June 1999, Paul hired a broker to sell the Property and on July 19, 1999, he entered into an

---

1. The Debtor also had pending a Motion to Adjudge Fleet in Contempt for violation of the discharge injunction. The Debtor has presented no evidence on this motion nor was it an issue listed in the parties' Joint Pre–Trial Order. For these reasons, the Debtor's Motion to Adjudge Fleet in Contempt is DENIED and this decision will only focus on the Motion for Turnover.

arm's-length purchase and sale agreement in the amount of $200,500. On August 22, 1999, Robert executed a second deed conveying the Property to his father, but this time a notary other than the grantee acknowledged the grantor's signature. At the closing on August 25, 1999, Fleet's recorded execution came to light as a cloud on the title. So that the closing could go forward, Fleet agreed to release its execution in exchange for $18,000 [2] being placed in escrow with Attorney Miller.

It is also stipulated that as of January 28, 1994, when Paul Valente filed the instant Chapter 7 petition, the market value of the Property was $150,000, and was encumbered by a first mortgage to Citizens Bank in the amount of $168,000.[3] It is also agreed that ever since the transfer of the Property to his son in 1992, Paul continued to maintain and exercised complete control over the Property. When asked at a deposition why his father transferred the Property to him, Robert testified: "Because he was trying to scam somebody or scam something, I don't know, beat something. It wasn't out of the generosity of his heart." Fleet Ex. 2, Deposition of Robert Valente, at 38, lines 16–18.

The Chapter 7 Trustee feels that he has no interest in this dispute, as the Debtor had no equity when he transferred the Property to his son in 1992, and that any attempt to render the 1992 transfer of the Property from Paul to his son, as fraudulent, would be futile.

Fleet argues that when Paul conveyed the Property to his son, he transferred only the bare legal title and retained the equitable ownership interest in the Property, and that when Fleet levied its execution against the Property on September 9, 1993, the lien attached to Paul's equitable interest. Also, Fleet argues, the lien was not avoided in Paul's bankruptcy and, therefore, it emerged intact after the case was closed.

The Debtor argues that for Fleet's lien to be valid, it must first be determined that the conveyance in 1992 was fraudulent. The Debtor stresses Fleet's failure to bring a fraudulent conveyance action before this late date, and that under First Circuit law it has failed to establish the elements of a fraudulent conveyance action. *See Ed Peters Jewelry Co., Inc. v. C & J Jewelry Co., Inc.*, 124 F.3d 252, 261–62 (1st Cir.1997).

### DISCUSSION

■ While it is unfortunate that a Debtor playing such a blatant shell game with his real estate might prevail, this one probably gets away with it, strictly by operation of law. This is so because in order for Fleet's lien to have attached, the Debtor must have retained an interest in the Property at the time he conveyed it to his son. This is the essence of a fraudulent conveyance.

An action under the Fraudulent Transfers Act is essentially one for property that properly belongs to the debtor and which the debtor has fraudulently transferred in an effort to put it out of the reach of creditors.... The transferee may have colorable title to the property, but the equitable interest—at least as far as the creditors (but not the debtor) are concerned—is considered to remain in the debtor so that creditors may at-

---

**2.** This was roughly Fleet's deficiency balance.

**3.** At the time the parties filed their Memoranda it was also their belief that the Property was encumbered by IRS tax liens exceeding $115,000. It was later determined that the tax liens did not encumber the Property.

tach or execute judgment upon it as though·the debtor never transferred it. *In re MortgageAmerica Corp.*, 714 F.2d 1266, 1275–76 (5th Cir.1983). Here, via a motion for turnover, Fleet seeks an adjudication that the 1992 conveyance was fraudulent, without the burden of pleading and proving the elements of a fraudulent conveyance action.

Even assuming that Fleet could overcome the statute of limitations problems,[4] however, the fact that the Property was encumbered by valid liens exceeding its value at the time of the conveyance is fatal to its case. In dealing with Rhode Island Fraudulent Conveyance Act, the First Circuit Court of Appeals has stated:

> The statute[5] covers only a "[fraudulent] transfer made or obligation incurred by a debtor." *Id.* § 6–16–4(a) (emphasis added). The term "transfer" is defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment·of money, release, lease, and creation of a lien or other encumbrance." *Id.* § 6–16–1(1). However, the term "asset" "does not include ... (1) Property to the extent it is encumbered by a valid lien." *Id.* § 6–16–1(b) (emphasis added). As Fleet unquestionably held a valid security interest in all Anson assets, and Peters did not establish that their fair value exceeded the amount due Fleet under its security agreement, see supra Section II.A, the Anson property conveyed to C & J did not constitute an "asset" and no cognizable "transfer" occurred under section 6–16–4(a). *See also Rich-*

*man v. Leiser*, 18 Mass.App.Ct. 308, 465 N.E.2d 796, 798 (1984) ("A conveyance is not established as a fraudulent conveyance upon a showing of a fraudulent intention alone; there must also be a resulting diminution in the assets of the debtor available to [unsecured] creditors.").

*Ed Peters Jewelry Co., Inc. v. C & J Jewelry Co., Inc.*, 124 F.3d 252, 261–62 (1st Cir.1997)(footnote omitted).

■ Like the defendant in *Peters*, and assuming the requisite intent that the Debtor intended to "scam somebody" by transferring the Property to his son for no consideration, it is immaterial under the Rhode Island statute, based upon the facts of this case. *See Id.* At the time of the conveyance, the Property was worth $150,000, but was subject to a valid first mortgage of $168,000. According to the rationale and holding of *Peters*, since Paul Valente had no equity in the Property when he conveyed it to his son in 1992, there was no cognizable transfer under the fraudulent transfer statute. Although there is plenty of it here, fraudulent intent alone is not enough. There must also be a resulting diminution in the assets of the Debtor for distribution to creditors, and in 1992 that did not happen.

For the foregoing reasons, Fleet's Motion for Turnover is DENIED, and the escrow agent, Samuel Miller, Esq., is ORDERED to release the funds in his possession to the Debtor.

Enter judgment consistent with this opinion.

---

4. If Fleet sought to bring an action under 11 U.S.C. § 548, it must be done within two years after the order for relief. *See* 11 U.S.C. § 546. If Fleet used state law to challenge the transaction, generally the limitations period is four years. *See* R.I. Gen. Laws § 6–16–9.

5. R.I. Gen. Laws §§ 6–16–1 et seq.