NATHAN RICHMAN, trustee, vs. ESSIE LEISER,
individually and as trustee.

Plymouth.    April 6, 1984. — June 28, 1984.

Present: GRANT, ROSE, & WARNER, JJ.

*Fraudulent Conveyance.*

Although the holder of a second mortgage on the home of her daughter and
son-in-law intended to place the property out of the reach of creditors
when she foreclosed on the mortgage and subsequently transferred title
to herself as trustee of a trust with spendthrift provisions for the benefit
of the daughter and son-in-law, these transactions did not amount to
fraudulent conveyances where at the time of the transactions the home
was encumbered well beyond its fair market value and where adequate
consideration had been given for the mortgage. [311-314]
In an action by a creditor against a transferee who had participated in certain
conveyances designed to place property of her two daughters and sons-in-
law beyond the creditor's reach, it was error to enter judgment holding
the transferee personally liable to the creditor where only one conveyance
actually placed assets beyond the creditor's reach and the proceeds of
this conveyance were disbursed directly to one of the debtors. [314-316]


CIVIL ACTION commenced in the Probate and Family Court
Department on December 1, 1981.

Upon removal to the Superior Court, the case was heard by
*Hurd, J.*

*Richard L. Wainwright* for the defendant.

*John J. Perenyi* for the plaintiff.

ROSE, J.  The defendant, Essie Leiser, appeals from portions
of a judgment setting aside as fraudulent conveyances (see
G. L. c. 109A) certain transactions in which she engaged with
respect to property originally belonging to a daughter and son-
in-law and holding her personally liable to the plaintiff in the
amount of $18,784.70. We reverse.

The plaintiff, Nathan Richman, as trustee of Equitable Realty Trust, advanced $22,000 toward the purchase of a convenience store, including building, stock, and the land on which the building sat. The purchasers were Harvey and Sari Kaplan and Gail and Gerald Rubin, the defendant Leiser's daughters and sons-in-law. Title to the store was taken in the names of Gail and Gerald Rubin. In Richman's presence, the Kaplans and Gerald Rubin signed a promissory note for the loan. Also in Richman's presence, Gerald, without authorization, as the judge found, signed Gail's name on the note. Gerald gave Richman a second mortgage on his interest in the store as security for the note. Gail gave no mortgage on her interest in the property.[1] The evidence indicates that the plaintiff, himself a lawyer, drafted the documents relating to the purchase of the store.

Several months later, the store began to founder. The Kaplans and Gerald Rubin fell behind on their payments to the plaintiff, and on other obligations as well. After the last payment made to the plaintiff in 1976, the outstanding balance on the note and mortgage was $18,784.70. Seeing imminent financial disaster for her daughters and sons-in-law, Leiser consulted a lawyer on how she could protect them from their creditors, particularly the plaintiff. Leiser, the Kaplans, and the Rubins all met with the lawyer on several occasions and determined to leave the affair in his hands. The lawyer arranged a number of transactions in which Leiser, the Kaplans, and the Rubins participated at his direction. Those transactions involved three pieces of property: the store, the Kaplans' home, and the Rubins' home. All of the transactions were undertaken admittedly for the purpose of protecting the Kaplans' and the Rubins' assets from their creditors.

---

[1] Evidence in the record suggests that the plaintiff and the first mortgagee took their mortgages from Gerald Rubin, only, on the belief that Gerald and Gail owned the property as tenants by the entirety, prior to February 11, 1980 (see St. 1979, c. 727, effective on that date), and that Gerald thus had the legal right to encumber his life estate in the entire property and his right of survivorship, leaving Gail only a survivorship interest. See *Raptes* v. *Pappas,* 259 Mass. 37, 38-39 (1927); *Turner* v. *Greenaway,* 391 Mass. 1002, 1003 (1984). Contrast G. L. c. 209, § 1, as appearing in St. 1979, c. 727. However, it appears that the deed to the Rubins did not specify ownership as tenants by the entirety. See G. L. c. 184, § 7.

*The Kaplans' home*. Leiser foreclosed by entry on a second mortgage which she held on the Kaplans' home.[2] The Kaplans had never made any payments to Leiser on the second mortgage. The Kaplans continued to live in their home and to make payments on the first mortgage on the property. They paid Leiser no rent. Leiser took title to the property by foreclosure deed for a stated consideration of $36,000 (the amount of the second mortgage), subject to the first mortgage. There is no dispute as to the procedural regularity of the entry and sale. Leiser then conveyed the property to herself as trustee for Sari Realty Trust, a trust containing spendthrift provisions created for the benefit of the Kaplans. The Kaplans continued to live in their home and to make payments on the first mortgage on the property.

*The Rubins' home*. The Rubins owned their home as tenants by the entirety. They conveyed their home to Leiser for no consideration. Leiser in turn conveyed the house to a good faith purchaser for $37,000. The Rubins attended that closing; Leiser did not. The net proceeds (roughly $10,000) were disbursed directly to Gerald Rubin.

*The store*. Gail and Gerald Rubin separately conveyed their interests in the store property to Leiser for no consideration. Leiser transferred the unencumbered interest she had taken from Gail to Conveyancing Concepts, Inc., for $6,000.[3] Leiser

---

[2] There is no dispute with respect to the validity of Leiser's second mortgage. Cf. *291 Washington St., Inc.* v. *School St. Liquors, Inc.*, 331 Mass. 150, 152-153 (1954). Leiser received that mortgage by assignment from one Kovick. Kovick had been Harvey Kaplan's business partner in a doughnut franchise operation. Kaplan gave Kovick the second mortgage of $36,000 on his home as security for Kovick's investment in the doughnut franchise. That mortgage was duly recorded. When Kovick threatened foreclosure, Leiser took assignment of the mortgage for $20,000. The $20,000 appears to have been fair consideration, as it exceeded the equity in the house which was then available for satisfaction of the second mortgage. The assignment was duly recorded.

[3] Conveyancing Concepts, Inc., was created by Leiser's lawyer, apparently for the sole purpose of purchasing the unencumbered one-half interest in the store. Leiser's lawyer was the sole officer and director of the corporation. The record does not disclose the ownership of the corporation's one hundred shares of common stock.

immediately remitted the proceeds to Gail. Leiser took Gerald's interest in the property subject to the first and second mortgages. The first mortgagee foreclosed on the property and delivered a deed to the plaintiff, the second mortgagee, for $21,000. The plaintiff then sold the property to one Manuel Pires for $37,000. Pires gave the plaintiff a mortgage on the property for $37,000. Trouble developed between the plaintiff and Pires when Pires discovered Gail Rubin's undissolved one-half undivided interest in the property which, by then, had been conveyed through Leiser to Conveyancing Concepts, Inc. Conveyancing Concepts, Inc., subsequently sold Pires that interest for $8,000. The plaintiff and Pires were engaged in litigation over the property when the plaintiff's action against Leiser went to judgment.

A judgment was entered setting aside the conveyances of the Kaplans' home and authorizing the plaintiff to levy execution on that property, and for the plaintiff against Leiser and Sari Kaplan, personally, in the amount of $18,784.70.[4]

1. *Conveyances of the Kaplans' Home.*

The plaintiff contends that the trial judge properly set aside as fraudulent conveyances Leiser's foreclosure on the Kaplans' home and her subsequent conveyance of the property into a spendthrift trust for the Kaplans' benefit. The plaintiff argues that Leiser's foreclosure was a "collusive foreclosure" (see *Sheffield Progressive, Inc.* v. *Kingston Tool Co.,* 10 Mass. App. Ct. 47, 50 [1980]), because Leiser had the actual intent to protect the property from the Kaplans' creditors and that the foreclosure thus violated G. L. c. 109A, § 7. The plaintiff further argues that Leiser's foreclosure rendered the Kaplans insolvent and thus violated G. L. c. 109A, § 4.

The defendant, Leiser, contends that the foreclosure and subsequent conveyance in trust were not fraudulent conveyances because those transactions placed no available asset of the Kaplans beyond the reach of their creditors. Leiser further

---

[4] Gerald and Gail Rubin were named as defendants but were never served with process. Harvey Kaplan's obligation to the plaintiff was discharged in bankruptcy. Sari Kaplan was a defendant but has not appealed.

argues that, as the holder of a concededly valid mortgage, she had the complete right to foreclose by entry on the property and to exercise the power of sale contained in her mortgage. Leiser says that, having taken a foreclosure deed on the property in her own name, she had the right to dispose of the property however she saw fit; thus, her choice to place the property in trust for her daughter and son-in-law is invulnerable to attack by the Kaplans' creditors. Leiser further argues that the conveyances could not be violative of § 4 because the Kaplans were not rendered insolvent by them, the property being encumbered well beyond its fair market value before Leiser's foreclosure, and because there was adequate consideration.

We agree with Leiser. A conveyance is not established as fraudulent conveyance upon showing of a fraudulent intention alone; there must also be a resulting diminution in the assets of the debtor available to creditors. See *Bryce* v. *National City Bank,* 17 F. Supp. 792, 796 (D.N.Y. 1937); *Stauffer* v. *Stauffer,* 465 Pa. 558, 576 (1976); *Newfield* v. *Ettlinger,* 22 Misc. 2d 769, 775 (N.Y. Sup. Ct. 1959), and cases therein cited. "Fraud, it must be noted, does not consist in mere intention, but in intention acted out, or made effectual by hurtful acts, in conduct that operates prejudicially upon the rights of others, and which was so intended. A fraudulent purpose is an important element in [a fraudulent conveyance] case, but it is not the only essential requisite; there must be superadded to it, besides the sale or transfer, actual fraud, hindrance, or delay resulting therefrom to creditors." Wait, Fraudulent Conveyances and Creditors Bills § 196, at 352 (3d ed. 1897). Glenn, Fraudulent Conveyances § 199, at 350-351 (rev. ed. 1940). See also *Kane* v. *Sesac,* 54 F. Supp. 853, 859-860 (S.D.N.Y. 1943). Where a creditor "could not have reached the property before the conveyance, it follows that the conveyance itself could not have been fraudulent as to him," notwithstanding the debtor's fraudulent intent. *Stauffer* v. *Stauffer,* 465 Pa. at 576.

Thus, even though, as has been conceded, Leiser, her family, and their lawyer plainly intended to place assets beyond the plaintiff's reach, we could not conclude on that basis alone that a fraudulent conveyance has been made. The foreclosure

and the subsequent transfer of the property in trust for the Kaplans' benefit removed no assets from the reach of the Kaplans' creditors since at the time of those transactions the Kaplans' home was encumbered well beyond its fair market value.[5] The conveyances injured neither the plaintiff nor any other creditor and thus could not be found to be fraudulent conveyances violative of § 7. See *Stauffer* v. *Stauffer,* 465 Pa. at 576. Likewise, the conveyances of the Kaplans' home cannot be violations of § 4, since they were not made for inadequate consideration and they did not render the Kaplans insolvent. Contrast *Nader* v. *Citron,* 372 Mass. 96, 104-105 (1977).

Moreover, it does not appear that, through the foreclosure, Leiser intended to defraud the plaintiff. The plaintiff's argument that Leiser's foreclosure was a "collusive foreclosure" misapprehends the meaning of that term. To be a "collusive foreclosure," a foreclosure must be based on a fraudulent mortgage (see *Ricker* v. *Mathews,* 94 N.H. 313 [1947]; *In re Colandrea,* 17 Bankr. 568, 581 [D.Md. 1982]; Glenn, Fraudulent Conveyances § 204, at 351 [rev. ed. 1940]), or it must be irregularly conducted so as to claim a greater portion of the mortgagor's property than necessary to satisfy the mortgage obligation (see *Joseph P. Manning Co.* v. *Shinopoulos,* 317 Mass. 97, 99 [1944]; *Sheffield Progressive, Inc.* v. *Kingston Tool Co.,* 10 Mass. App. Ct. at 49-50; *Ever-Ready Label Corp.* v. *Stuyvesant Photo Engraving Corp.,* 36 N.Y.S.2d 468, 472-473 [1942]; Glenn, Fraudulent Conveyances § 214(a), at 367-368 [rev. ed. 1940]). See also *Shay* v. *Gagne,* 275 Mass. 386 (1931); *Smart* v. *Baroni,* 360 Pa. 296 (1948). There is no dispute as to the validity of Leiser's second mortgage. See note 2, *supra.* Nor is there any indication that through the foreclosure proceedings, Leiser received assets in excess of the mortgage obligation. In these circumstances, the foreclosure was not a collusive foreclosure undertaken to defraud the plaintiff in violation of § 7.

---

[5] In 1976, the Kaplans' home had a fair market value of approximately $35,000. In addition to the second mortgage for $36,000, the property was encumbered by a first mortgage for $28,000 and a Federal tax lien of $11,000.

Accordingly, those parts of the judgment setting aside the foreclosure and subsequent conveyance of the Kaplans' home by Leiser as fraudulent conveyances and authorizing the plaintiff to levy execution on that property are reversed.

2. *Leiser's Personal Liability.*

The trial judge entered judgment against Leiser, personally, for the entire debt owed the plaintiff by the Kaplans and Gerald Rubin. Leiser contends that the judgment was erroneous as matter of law because she was never personally obligated to the plaintiff for the debt in question and because she holds no property or proceeds of property that properly belong to the Kaplans or to Gerald Rubin. Leiser contends that under the authority of *Northborough Natl. Bank* v. *Risley,* 384 Mass. 348 (1981), she is entitled to show that she returned to the debtors whatever fraudulently conveyed monies and properties she had held and that such showing discharges her from liability to the plaintiff. Leiser argues that she was no more involved in any fraudulent conveyance of the debtors' property than was the debtor's transferee in *Northborough.*

In *Northborough,* after mesne conveyances, the debtor's brother-in-law took title to real estate properly belonging to the debtor without payment of consideration, knowing that the transfer was intended to place the property beyond the reach of creditors. The brother-in-law then conveyed the property to good faith purchasers for value, endorsed the check for the proceeds in blank, and delivered the check to the debtor. Relying on *Modin* v. *Hanron,* 346 Mass. 629, 631-632 (1964), the Supreme Judicial Court held that the brother-in-law was entitled to show his voluntary reconveyance of the property (in the form of proceeds) to the debtor and that such showing discharged the brother-in-law from any liability to the creditor. However, the court also indicated that a transferee who is more actively involved in the debtor's fraud on his creditors or who seeks and receives some personal benefit from the fraud may be estopped from making such a showing in discharge of his personal liability to the defrauded creditor. *Northborough Natl. Bank* v. *Risley,* 384 Mass. at 349-350.

We agree with Leiser. At the outset, we note that in no event could judgment be entered against Leiser for a sum in excess of the value of the assets which she knowingly assisted the debtors in fraudulently placing beyond creditors' reach.[6] See *David* v. *Zilah,* 325 Mass. 252, 256 (1950); *Citizens Bank & Trust Co.* v. *Rockingham Trailer Sales, Inc.,* 351 Mass. 457, 461-462 (1966). Of the conveyances undertaken with the intent to place the Kaplans' and Gerald Rubin's assets beyond the reach of their creditors, the only conveyance which actually did so was the conveyance of Gerald Rubin's interest in the Rubins' home.[7] Gerald Rubin's conveyance of that interest to Leiser without consideration and Leiser's subsequent conveyance to a good faith purchaser for value removed Gerald Rubin's equity from the reach of the plaintiff and other creditors.[8] Thus, judgment could be entered against Leiser for at

[6] Where a transferee knowingly participates in a fraudulent conveyance, judgment properly may be entered holding the transferee personally liable to a defrauded creditor, at least to the extent of the value of property or proceeds remaining in the transferee's possession. *Northborough Natl. Bank* v. *Risley,* 384 Mass. 348 (1981). Such a judgment, as distinct from a judgment allowing only levy and execution on or attachment of the fraudulently conveyed property, itself (see G. L. c. 109A, § 9), is based upon an unjust enrichment theory. See Note, Tort Liability for Fraudulent Conveyances, 19 Stan.L.Rev. 636, 638 and n.14 (1967), citing *Perkins* v. *Becker's Conservatories,* 318 Mass. 407 (1945). This is the rule in many jurisdictions. See *Flowers & Sons Dev. Corp.* v. *Municipal Court of San Francisco,* 86 Cal.App.3d 818 (1978); *Damazo* v. *Wahby,* 269 Md. 252 (1973); *In re Checkmate Stereo & Electronics Ltd.,* 9 Bankr. 585 (E.D.N.Y. 1981).

[7] The conveyances with respect to the store property did not place any of Gerald Rubin's assets beyond the reach of the plaintiff, since Gerald's interest in the store was conveyed subject to the first and second mortgages, and since the plaintiff could not have reached Gail's assets. Nor do those conveyances appear to have placed any of Gail Rubin's assets beyond the reach of any of her creditors since there was no showing that Gail Rubin was indebted to anyone, including the plaintiff. The conveyances of the Kaplans' home have been discussed above.

[8] The plaintiff, as a creditor of Gerald Rubin, could have levied and sold on execution Gerald's interest in the Rubins' home, held in a tenancy by the entirety created before February 11, 1980 (see note 1, *supra*). That interest consisted of the right to possession of the entire property and to income therefrom and the right of survivorship. *Raptes* v. *Pappas,* 259 Mass. 37, 38-39 (1927). See Park, Real Estate Law § 129, at 161-163 (2d ed. 1981). Contrast G. L. c. 209, § 1, as appearing in St. 1979, c. 727,

most the value of Gerald Rubin's interest in the Rubins' tenancy by the entirety (see note 8, *supra*), which was certainly no greater than the net proceeds of $10,000 from the sale of that property. The judgment holding Leiser personally liable for the entire debt of over $18,000 owed to the plaintiff by the Kaplans and Gerald Rubin is erroneous. See *David* v. *Zilah, supra* at 256; *Citizens Bank & Trust Co.* v. *Rockingham Trailer Sales, Inc., supra* at 462.

Nor, in these circumstances, may judgment be entered against Leiser for the value of Gerald Rubin's equity in the Rubins' home. Leiser never held the proceeds from the sale of the home; they were disbursed directly to Gerald Rubin. Leiser never sought or received any benefit from any of the conveyances involving the Rubins' home. Thus, although Leiser shared Gerald Rubin's fraudulent intent, her involvement in the fraudulent transfers was no more significant than that of the fraudulent transferee in *Northborough Natl. Bank* v. *Risley, supra*. Leiser was entitled to show her voluntary relinquishment of the proceeds from the sale of the Rubins' home to Gerald Rubin. That showing discharges her from liability to the plaintiff. Accordingly, that part of the judgment against Leiser is vacated.

The judgment is modified as follows. Paragraph one is struck. A new first paragraph is substituted which dismisses the action as to Leiser, personally. Paragraphs three, four, five, and six are struck and a new third paragraph is substituted which declares that the foreclosure on, and subsequent conveyance of, the Kaplans' home by Leiser were not fraudulent as to the plaintiff.

*So ordered.*

effective February 11, 1980. In 1976, the Rubins' home had a fair market value of $37,500. It was encumbered by a first mortgage of $27,000. We make no attempt to determine the value of Gerald's interest. The plaintiff could also have attached Gerald's interest in the proceeds from the sale of the Rubins' home. The proceeds of the sale of realty held by the entirety before February 11, 1980 are personal property held by the entirety. *Smith* v. *Tipping,* 349 Mass. 590, 592 (1965). Thus, Gerald had the right to the income from the proceeds during his and Gail's joint lives and the right to all of the proceeds in the event he survived Gail. See *Ronan* v. *Ronan,* 339 Mass. 460, 463 (1959).