**FEDERAL REFINANCE CO., INC., Plaintiff,**

v.

**Deborah KLOCK; and Frank Romano, Jr., Defendants.**

**No. CIV.A. 98–12638–WGY.**

United States District Court, D. Massachusetts.

Oct. 25, 2002.

Judd L. Peskin, Weiner & Rothschild, Gary M. Weiner, Weiner and Rothchild, P.C., Springfield, MA, for Plaintiff.

Richard J. D'Agostino, D'Agostino, Downey, & Assoc., Valerie S. Carter, Boston, MA, for Defendants.

Irving D. Labovitz, Cooley, Shrair, Alpert, Labovitz & Dambrov, Springfield, MA, for Movant.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

On March 3, 1997, the Plaintiff in this action, Federal Refinance Co., Inc. ("Federal Refinance") secured a judgment against the Defendant in this action, Frank Romano, Jr. ("Romano") for $331,608.78. *Federal Refinance Co. v. Romano*, No. 95–10941, slip. op. (D.Mass. March 3, 1997) (Bowler, M.J.). Federal Refinance then sought to collect on its judgment, only to discover that Romano's chief asset—part ownership of a series of nursing homes—

was gone. Romano had transferred his 17,500 shares (constituting 43.75 per cent of the voting shares) of the Essex Group (the holding company operating the nursing homes) to a trust, in which his children were the designated beneficiaries. Federal Refinance then brought this suit, alleging that the transfer to the trust was fraudulent and therefore ought be voided. After a two-day trial, this Court entered findings of fact and conclusions of law, wherein it held the transfer of the stock to the trust to be in violation of the Massachusetts General Laws, Chapter 109A, Section 4 (the Uniform Fraudulent Transfer Act ("UFTA")). Findings and Rulings Tr. at 2–5. The Court ordered the trust instrument set aside and voided, and the shares to be deemed held in Romano's hands. *Id.* at 5–6.

Subsequent to entry of that judgment, with the shares now back in Romano's hands, Romano transferred the Essex Group shares to Essex Group,[1] in return for $85,000.00 credit towards an indebtedness, evidenced by Romano's promissory note held by Essex Group. *See* Ex. H to Pl.'s Mot. to Reconsider Denial of Pl.'s Mot. to Appoint Receiver [Docket No. 103]. The promissory note relates to an approximately $15,000,000.00 judgment obtained by the FDIC in separate litigation, *FDIC v. Elder Care Services, Inc.*, No. 91–12739, slip. op. (D. Mass August 4, 1995) (Gertner, J.), *aff'd* 82 F.3d 524 (1st Cir. 1996), and entered against Romano in his personal capacity. The FDIC subsequently sold the judgment to CNF First Associates Limited Partnership ("CNF"). The

---

1. The transfer documents were dated April 22, 2002, before this Court actually entered judgment. Federal Refinance contends this evidences an intent secretly to hedge against a potential adverse judgment from this Court. Romano contends that this was merely a scrivener's error, and that the handwritten date of April 27, 2002, reflects the actual date of transfer. The Court declines to resolve this dispute and assumes that the transfer was post-judgment.

Essex Group—the company controlled by Romano through his 43.75 percent ownership interest and almost wholly owned (91 percent) by his mother and himself—subsequently purchased the judgment from CNF for $85,000.00. Thus, Romano transferred his shares to his and his mother's company in return for a partial discharge of his personal debt.

The UFTA, unlike its predecessor the Uniform Fraudulent Conveyance Act, permits the undoing of transfers by insolvents, even if made for fair consideration, not to hinder creditors, and without fraudulent intent, if the transfer was preferential. Mass. Gen. L. ch. 109A § 6(b); *e.g., Prairie Lakes Health Care Sys., Inc. v. Wookey,* 583 N.W.2d 405, 413 (S.D.1998). *See generally* Paul P. Daley & Mitchel Appelbaum, *The Modernization of Massachusetts Fraudulent Conveyance Law: The Adoption of the Uniform Fraudulent Transfer Act,* 83 Mass. L.Rev. 337, 342–44 (1998).

■ Section 6(b) establishes four requisites to holding a preferential transfer fraudulent, and hence void. First, the claim of the protesting creditor must arise before the transfer. Mass. Gen. L. ch. 109A § 6(b). In this case, it is undisputed that Federal Finance's debt arose before the April 2002 stock transfer.

Second, the transfer must have been made to an insider for an antecedent debt. *Id.* In this case, at the time of transfer, Romano owned 43.75 percent of Essex Group's voting stock. As such, he was a controlling shareholder. Section 1 defines "insider" in part as a "corporation of which the debtor is a . . . person in control." *Id.* § 2. Accordingly, Essex Group was an insider of Romano. Moreover, section 2 defines "insider" alternatively as "an affiliate,

or an insider of an affiliate," and defines "affiliate" as "a corporation twenty percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor . . . ." *Id.* Thus, Essex Group is also an affiliate—and therefore, an insider—of Romano. Accordingly, this transfer was made to an insider. It is undisputed that the debt the stock transfer partially paid arose before the April 2002 stock transfer. Accordingly, this transfer was to an insider for an antecedent debt.

Third, the transferor must have been insolvent at the time of the transfer. *Id.* § 6(b). It is undisputed that the $15,000,000.00 debt is still outstanding, along with the $331,000.00 judgment (on both of which interest presumably accrues). It is also undisputed that these liabilities far exceed any assets of Romano. Accordingly, it is beyond peradventure that Romano is insolvent.

The last requirement is that "the insider had reasonable cause to believe that the debtor was insolvent." *Id.* § 6(b). In this case, it is obvious that Essex Group knew that Romano was insolvent. Why else would it not seek to enforce its promissory note? Moreover, Essex Group itself has argued that it negotiated this transfer as a bona fide creditor seeking partially to recover the debt owed it. Accordingly, the final element of section 6 is met. The insider—Essex Group—knew that the debtor—Romano—was insolvent.

■ Having met all four elements of section 6, the transfer to Essex Group is preferential—and hence fraudulent—as to Federal Refinance. Accordingly, this Court orders the transfer voided, and the shares deemed held in Romano's hands. The Court further enjoins Romano from

transferring, hypothecating, or encumbering the shares, or in any other way impeding the shares' value or availability to satisfy the judgment in *Federal Refinance Co. v. Romano*, No. 95–10941, slip. op. (D.Mass. March 3, 1997) until such time as Chief Magistrate Judge Bowler orders the injunction lifted.[2]

Accordingly, Federal Refinance's Motion to Reconsider the Court's Order Denying their Motion to Appoint a Receiver is DENIED in part and GRANTED in part.

SO ORDERED.

**2.** Federal Refinance also complains that Romano lied in discovery. Accordingly, it moves the Court to enter a finding of perjury and impose sanctions. In short, Federal Refinance, in its interrogatories, asked Romano to identify all outstanding indebtedness. Romano identified the $15,000,000.00 indebtedness to the FDIC, and disclosed that the indebtedness had been sold to CNF. What Romano did not disclose was that the company he controlled had subsequently purchased the debt.

The Court declines to enter a finding of perjury, but does note that Romano's response was a less than forthcoming answer to the interrogatory. In fact, it was actively misleading. Rather than denoting the original indebtedness, Romano went so far as to identify the purchase trail, thus implying that the full purchase trail (at least as to his knowledge) had been disclosed. Whether the question called for such disclosure is irrelevant. Having chosen to speak, Romano was obligated to speak fully and truthfully.

The Court, therefore, holds that Romano's response to the interrogatory was insufficient, and imposes sanctions pursuant to Federal Rule of Civil Procedure 37. Said sanctions are to appoint the receiver proposed by Federal Refinance *nunc pro tunc* as of April 23, 2002 to hold the shares until Chief Magistrate Judge Bowler directs otherwise.

Moreover, it appears that Romano received and followed the advice of counsel throughout the twists and turns by means of which he sought to elude his creditors. While vigorous advocacy ought be encouraged, his antics before this Court are too slick by half. Accordingly, a certified copy of this Memorandum and Order shall be forwarded to the Massachusetts Board of Bar Overseers for inquiry and report concerning whether the disciplinary rules of this Court have been violated.