# United States Court of Appeals

## For the First Circuit

No. 02-1654

FEDERAL REFINANCE CO., INC.,
Plaintiff, Appellant,

v.

DEBORAH KLOCK ET AL.,
Defendants, Appellees.

Nos. 02-1753
    02-2547

FEDERAL REFINANCE CO., INC.,
Plaintiff, Appellee,

v.

DEBORAH KLOCK ET AL.,
Defendants, Appellees.

FRANK ROMANO, JR.,
Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Selya, Circuit Judge,
Coffin, Senior Circuit Judge,
and Lipez, Circuit Judge.

Judd L. Peskin, with whom Weiner and Peskin, P.C. was on brief, for plaintiff.
Valerie S. Carter, with whom Carter & Doyle, LLP was on brief, for defendant Klock.

Gary C. Crossen, with whom Rubin & Rudman, LLP, Valerie S. Carter, and Carter & Doyle, LLP were on brief, for defendant Romano and intervenor-defendant Essex Group, Inc.

———————————

December 5, 2003

———————————

**SELYA**, **Circuit Judge**.  Many people think that securing a favorable judgment from a court of competent jurisdiction marks the end of a plaintiff's journey.  In some instances, however, that is only a step along the road to meaningful relief.  This is a case in point.

In 1997, Federal Refinance Co., Inc. (Federal) obtained a deficiency judgment for over $331,000 against Frank Romano, Jr. It spent the next five years trying to satisfy the judgment by levying upon Romano's principal asset (his shares of stock in a closely held corporation).  When the stock proved elusive, Federal asked the district court to set aside a series of allegedly fraudulent transfers.  The court's ensuing rulings did not entirely please either Federal or Romano.  Both appeal.

We affirm the district court's bench decision (i) setting aside Romano's 1988 transfer of the shares to a family trust and (ii) upholding the creation and funding of certain limited partnerships.  We are less sanguine, however, about the court's subsequent invalidation of yet a third transfer.  See  Fed. Refin. Co. v. Klock, 229 F. Supp. 2d 26 (D. Mass. 2002).  Finding a procedural error, we vacate that order and remand for further proceedings.

## I.  BACKGROUND

The background facts are largely undisputed.  In 1980, Wickford Realty Trust obtained a mortgage loan from Second National

Bank. Romano unconditionally guaranteed repayment of the loan, which eventually went into default. Federal acquired the defaulted loan and conducted a foreclosure proceeding. Left with a deficiency, Federal looked to the guaranty and brought a diversity action against Romano in the United States District Court for the District of Massachusetts. On March 3, 1997, the court awarded Federal a judgment for $331,608.78.

Romano was thought to be a principal of a closely held corporation, Essex Group, Inc. (Essex), a holding company whose six wholly-owned subsidiaries each operated a nursing home. Before any of the transfers here at issue, Essex's shares were held 43.75% by Romano, 47.25% by his mother Mary, and 9% by the Doyle Family Trust.

When Federal attempted to satisfy the judgment by garnishing Romano's stock, it learned that the stock had flown the coop. In 1988, Romano had transferred 17,500 shares (the whole of his 43.75% equity interest), without pecuniary consideration, to a newly formed trust (the B&T Trust) of which he was the trustee and his children were the beneficiaries.

Federal's frustration grew even more pronounced when it discovered that, between 1991 and 1994, Essex had created three limited partnerships. Each had an Essex subsidiary as its general partner (with a 20% share of the profits) and Romano's wife, Deborah Klock, as its sole limited partner (with an 80% share of

-4-

the profits).  Moreover, the general partners had divested themselves of their real estate, each having spun off title to its nursing home into its limited partnership.  These transactions arguably diluted the value of Essex's shares.

Since Romano did not appear to have other significant assets, Federal sued to get the shares back into his hands[1] and to collapse the limited partnerships.

## II.  THE BENCH DECISION

All of these claims were tried to the court.  The trial ended in a bench decision handed down on April 23, 2002.  As we explain below, each side got half a loaf.

### A.  Count I.

The first count of Federal's complaint asked the court to invalidate the stock transfer as a fraudulent conveyance under

---

[1]As a subset of this goal, Federal also sought the appointment of a receiver to take temporary custody of the shares.  Although the court initially denied that request, Federal subsequently renewed it.  We discuss the fate of Federal's renewed request infra.

section 4 of the Uniform Fraudulent Conveyance Act (UFCA).[2]  The

UFCA's constructive fraud provision, in force in 1988, read:

> Every conveyance made and every obligation
> incurred by a person who is or will be thereby
> rendered insolvent is fraudulent as to
> creditors without regard to his actual intent
> if the conveyance is made or the obligation is
> incurred without fair consideration.

Mass. Gen. Laws ch. 109A, § 4 (repealed 1996).  The district court

determined that Romano's 1988 conveyance violated this section.  It

set aside the transfer to the trust and decreed that the 17,500

shares of stock were "deemed to be in the unencumbered possession

of . . . Romano."

### B.  Counts II-IV.

Counts II through IV of Federal's complaint alleged that

the purpose and effect of the creation and funding of the

partnerships was to dilute the value of Romano's stock.  On this

basis, Federal sought to collapse the limited partnerships.  In

mounting this attack, it relied upon both UFCA § 4, quoted supra,

and UFCA § 7.  The latter provision is an actual fraud provision.

Throughout the relevant time frame, it read:

---

[2]Massachusetts repealed the UFCA in 1996 and replaced it with
the Uniform Fraudulent Transfer Act (UFTA).  1996 Mass. Acts 157
(effective Oct. 8, 1996).  Both acts carry the same chapter number,
Mass. Gen. Laws ch. 109A.  Massachusetts law is clear that the UFTA
is not to be applied retroactively.  First Fed. Sav. & Loan Ass'n
v. Napoleon, 701 N.E.2d 350, 352 (Mass. 1998); Yankee Microwave,
Inc. v. Petricca Communic. Sys., Inc., 760 N.E.2d 739, 754 n.21
(Mass. App. Ct. 2002).  Because the conveyances that we have
mentioned up to this point took place during the currency of the
UFCA, that version of chapter 109A governs our analysis of them.

> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, is fraudulent as to both present and future creditors.

Mass. Gen. Laws ch. 109A, § 7 (repealed 1996).

The district court ruled against Federal on these counts. It rejected Federal's constructive fraud claim, finding that the corporations were the actual transferors and that they were not insolvent at the times of the transfers. The court likewise rejected the claim of actual fraud, crediting evidence that there was a legitimate business purpose behind the creation and funding of the limited partnerships, namely, that the restructuring was a prerequisite to obtaining needed financing from the United States Department of Housing and Urban Development (HUD).

## III.  THE POST-TRIAL PROCEEDINGS

Having won a partial victory, Federal filed a motion in aid of judgment on May 2, 2002. See Fed. R. Civ. P. 69(a). In that motion, Federal asked the district court to reach and apply the 17,500 shares of Essex stock. Much to Federal's dismay, it learned that the shares had slipped away again. The tale follows.

At some point (the exact time is immaterial for present purposes), Essex had purchased from another of Romano's creditors a $15,000,000 debt. See FDIC v. Elder Care Servs., Inc., 82 F.3d 524, 525-26 (1st Cir. 1996) (describing the origin of the debt). In late April of 2002 (whether before or after the date of the

district court's bench decision is not entirely clear), Romano transferred his 17,500 shares to Essex, ostensibly in exchange for an $85,000 credit and a ten-year forbearance agreement on that indebtedness.

Faced with a Tantalean predicament, Federal promptly moved to reconsider the denial of its motion for the appointment of a receiver, see supra note 1, and to annul this most recent conveyance. Federal averred that the 2002 transaction should be rescinded as preferential. Because this latest transfer took place after the effective date of the Uniform Fraudulent Transfer Act (UFTA), that updated version of chapter 109A governed the claim asserted. The UFTA provides in pertinent part:

> A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Mass. Gen. Laws ch. 109A, § 6(b).

The district court saw no need to take evidence, but, rather, summarily voided the transfer as preferential. Fed. Refin., 229 F. Supp. 2d at 28. The court also ensured that the elusive shares would stay put, enjoining Romano from transferring or encumbering them in any way that might interfere with Federal's efforts to reach and apply. Finally, as a sanction for Romano's misconduct during discovery, the court granted Federal's renewed

-8-

motion for the appointment of a receiver to hold the shares for the time being.  See id. at 28-29 & n.2.

## IV.  THE APPEALS

The parties have cross-appealed.  With respect to the district court's bench decision, Romano challenges the order voiding the transfer to the B&T Trust whereas Federal challenges the order upholding the creation and funding of the limited partnerships.  With respect to the district court's subsequent written decision, Romano and Essex — which has intervened — challenge the order invalidating the stock-for-credit-and-forbearance arrangement.  In the pages that follow, we address these disputes sequentially.

## V.  THE TRANSFER TO THE B&T TRUST

UFCA § 4 sets out two basic conditions for setting aside a transfer on the ground of constructive fraud:  the transferor must have (i) been insolvent at the time of the conveyance (or rendered insolvent by it), and (ii) made the conveyance without fair consideration.  Boston Trading Group v. Burnazos, 835 F.2d 1504, 1510 (1st Cir. 1987).  A person is insolvent for these purposes when the readily realizable market value of his assets is less than the amount required to pay his existing debts as they become due.  First Fed. Sav. & Loan Ass'n v. Napoleon, 701 N.E.2d 350, 353-55 (Mass. 1998).  Fair consideration is given in exchange for transferred property when, "as a fair equivalent therefor, and

in good faith, [other] property is conveyed or an antecedent debt is satisfied."  Boston Trading Group, 835 F.2d at 1512 (quoting former Mass. Gen. Laws  ch. 109A, § 3 (repealed 1996)).

On appeal, Romano mounts a rather anemic attack on the district court's initial insolvency determination.  He argues, in substance, that the court could not reach a decision as to his solvency without some evidence as to the value of the Essex stock.  This argument is jejune.  His own testimony established that the 17,500 shares of Essex stock were his only significant asset at the relevant time (1988) and that he was then personally obligated to repay over $10,000,000 in loans that were about to go into default.  If the stock had little value, Romano was insolvent.  Conversely, if the stock's value exceeded Romano's massive liabilities, then the transfer would have rendered him insolvent.  Either way, Romano's attack misfires.

His challenge to the court's conclusion that the transfer lacked fair consideration is hopeless.  He admitted that he received no money or property in return for the shares.  And although his brief includes a perfunctory assertion that the transfer was in fact adequately supported by the love and affection of his children, he points us to no case law that suggests that, for purposes of the UFCA, such intangibles may supplant money, property, or satisfaction of an antecedent debt as fair consideration.

Romano's only colorable argument implicates the district court's ruling in response to a motion in limine. In the pretrial proceedings, Romano identified an expert witness whose testimony was intended to show that, at the time of the conveyance to the B&T Trust, the 17,500 shares were worthless. Federal moved in limine to exclude the testimony. Romano objected, exhorting the court to allow his expert to testify on the theory that a fraudulent conveyance action will not lie if the asset conveyed is worthless at the time of transfer.[3] The court granted the motion in limine, holding that the value of the stock was legally irrelevant. Romano asks us to overturn this ruling, vacate the order setting aside the transfer, and remand for further proceedings.

As framed, this assignment of error presents an abstract legal question regarding the proper interpretation of a state statute. Such questions engender de novo review. See Salve Regina Coll. v. Russell, 499 U.S. 225, 231 (1991); Protective Life Ins.

---

[3]At oral argument in this court, Romano's counsel suggested that the expert testimony should have been allowed to show that the value of the shares (zero) was equal to what B&T paid for them (nothing), and that, therefore, the transfer had been for fair consideration. We disregard this argument because Romano never advanced it in the district court. See Teamsters Union, Loc. No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992) ("If any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal."); Clauson v. Smith, 823 F.2d 660, 666 (1st Cir. 1987) (similar).

Co. v. Dignity Viatical Sett. Partners, 171 F.3d 52, 54 (1st Cir. 1999).

Our starting point is, of course, the statutory text. UFCA § 4 authorizes the setting aside of certain conveyances. It defines a conveyance as "every payment of money, assignment, release, transfer, lease, mortgage or pledge of tangible or intangible property, and also the creation of any lien or incumbrance." Nothing in the statute qualifies the term "property" or in any way indicates a legislative intent to limit the statute's reach to conveyances involving property having a positive market value.

Finding no comfort in the language of the UFCA, Romano falls back upon the decision in Richman v. Leiser, 465 N.E.2d 796 (Mass. App. Ct. 1984). That decision cannot carry the weight that Romano loads upon it.[4]

In Richman, an unsecured creditor attempted to set aside a conveyance of property encumbered by liens exceeding its market value. Despite a showing of fraudulent intent, the court refused to invalidate the transfer. The court began with the proposition that "[a] conveyance is not established as a fraudulent conveyance upon showing of a fraudulent intention alone; there must also be a

_____

[4]The other cases cited by Romano, e.g., Xerox Fin. Servs. Life Ins. Co. v. Sterman (In re Sterman), 244 B.R. 499, 514 (D. Mass. 1999); Shamrock, Inc. v. FDIC, 629 N.E.2d 344, 349 (Mass. App. Ct. 1994), do little more than cite to Richman. They add nothing to Romano's argument.

-12-

resulting diminution in the assets of the debtor available to creditors." Id. at 798. It found no such diminution, reasoning that the complaining unsecured creditor "could not have reached the property before the conveyance," and so "the conveyance itself could not have been fraudulent as to him." Id. at 799 (quoting Stauffer v. Stauffer, 351 A.2d 236, 245 (Pa. 1976)).

Romano reads this language to signify that a fraudulent conveyance claim will not lie unless a debtor has equity in the transferred property. Richman, however, does not sweep so broadly. The linchpin of the Richman decision is the principle that a transfer of fully encumbered property (i.e., property that is mortgaged for more than it is worth and, thus, has no residual value) puts no otherwise available assets beyond the grasp of an unsecured creditor. That principle makes good sense: whether or not the debtor effects a transfer, the accumulated security interests will prevent an unsecured creditor from reaching and applying the overencumbered property. Cf. Stauffer, 351 A.2d at 245 (refusing to set aside a conveyance of property held by the entireties because the husband's creditor could not have reached the asset pre-conveyance).

The case at hand is cut from a different cloth. The shares of Essex's stock were free and clear at the time that Romano signed them over to the B&T Trust. Absent the transfer, Federal could have reached the stock — whatever its value — in an effort to

-13-

satisfy the judgment. Thus, the transfer put property that would otherwise have been available out of the complaining creditor's reach. For that reason, Richman is inapposite.

This result comports with the policies underlying the UFCA. "The purpose of the UFCA is to preserve a debtor's assets so that creditors may look to them in the event that the debtor ceases payments . . . ." First Fed. Sav. & Loan, 701 N.E.2d at 354-55 (citations omitted). A debtor "may not give [his assets] away and thereby put them beyond the reach of creditors." Id. at 355. Given the district court's factual findings, Romano's conduct falls into the heartland of the prohibition against fraudulent conveyances. Allowing an exception on the ground that the shares were worthless would be at odds with the rationale underlying that prohibition. We conclude, therefore, that the district court did not err in denying the motion in limine.

Romano makes a related claim of error implicating the district court's denial of his motion for judgment as a matter of law. See Fed. R. Civ. P. 52(c). In the course of arguing that motion, he vouchsafed that Federal could not make the required prima facie showing of Romano's insolvency at the time of the transfer without some evidence as to the value of the shares. He now assigns error to the court's denial of this motion. This is an old whine in a new bottle. The argument essentially repeats a claim already made and rejected. See supra p.10. As said, the

-14-

evidence established that Romano was deeply in debt at the time of the transfer and that the transferred stock had been his only substantial asset. Hence, Federal made out a prima facie case of insolvency. Since Romano did not rebut this showing — indeed, he made no discernible effort to do so — the lower court did not err in denying the motion for judgment as a matter of law.

Before leaving this transfer, we address one related item. At the tail end of its brief, Federal makes a perfunctory argument to the effect that the district court erred in denying its request for attorneys' fees.

We need not tarry. Federal's offhand pitch is unaccompanied by any developed argumentation. Under our precedents, therefore, it merits summary rejection. See, e.g., Blake v. Pellegrino, 329 F.3d 43, 50 (1st Cir. 2003); Ryan v. Royal Ins. Co., 916 F.2d 731, 734 (1st Cir. 1990); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). In all events, neither the UFCA nor the guaranty contains a fee-shifting provision, and Federal offers us no reason to exempt this case from the usual rule that, absent a specific statutory or contractual fee-shifting provision, a prevailing party cannot recover attorneys' fees as of right from the losing party. See Chambers v. Nasco, Inc., 501 U.S. 32, 45 (1991); Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 258-59 (1975).

**VI. THE CREATION AND FUNDING OF THE LIMITED PARTNERSHIPS**

Federal cross-appeals from the district court's determination that the creation of the limited partnerships and the subsequent transfers to them of the nursing home properties did not constitute fraudulent conveyances under the UFCA. In Federal's estimation, these transactions were both constructively and actually fraudulent. Before analyzing Federal's contentions, we pause to clarify the standard of review.

**A. <u>Standard of Review</u>.**

A party who challenges a district court's findings of fact, arrived at after a bench trial, faces a steep uphill climb. When a district court finds the facts without the intervention of a jury, the court of appeals is not at liberty to start afresh. <u>See</u> <u>Cumpiano</u> v. <u>Banco Santander</u>, 902 F.2d 148, 152 (1st Cir. 1990); <u>Keyes</u> v. <u>Sec'y of Navy</u>, 853 F.2d 1016, 1019 (1st Cir. 1988); <u>see also</u> Fed. R. Civ. P. 52(a). "The trial judge sees and hears the witnesses at first hand and comes to appreciate the nuances of the litigation in a way [that] appellate courts cannot hope to replicate." <u>Cumpiano</u>, 902 F.2d at 152. Consequently, "[i]f the district court's account of the evidence is plausible . . . the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." <u>Anderson</u> v. <u>City of Bessemer City</u>, 470 U.S. 564, 573-74 (1985). In the last analysis, factual findings or

conclusions drawn therefrom may only be set aside if, after a searching review of the entire record, the court of appeals "form[s] a strong, unyielding belief that a mistake has been made." Cumpiano, 902 F.2d at 152.

Federal strives to free itself from this inhospitable standard of review by arguing that the trial court merely determined the legal effect of uncontroverted facts. Thus, Federal's thesis runs, the court's decision should be reviewed de novo. We reject this thesis for two reasons.

In the first place, Federal's characterization of the material facts as uncontroverted is wishful thinking. Factual disputes sprout throughout the record like weeds in an untended garden. Although Federal classifies such things as the protagonists' motives in restructuring the nursing home operations and the rationale for naming Klock, rather than Romano, as the limited partner, as questions of law, that taxonomy is unrealistic. We consistently have refused to permit parties to advantage themselves by couching questions of fact as questions of law, see, e.g., Reliance Steel Prods. Co. v. Nat'l Fire Ins. Co., 880 F.2d 575, 577 (1st Cir. 1989), and we see no reason to abandon that salutary practice today. The clearly erroneous standard of review "cannot be evaded by the simple expedient of creative relabeling." Id.

In the second place, even if the facts were uncontroverted, that circumstance alone would not alter the standard of review. When the trier's findings depend upon its choice of competing inferences drawn from undisputed facts, the clearly erroneous standard continues to apply. See Jackson v. United States, 156 F.3d 230, 233 (1st Cir. 1998); Dedham Water Co. v. Cumberland Farms Dairy, Inc., 972 F.2d 453, 457 (1st Cir. 1992). To the extent that the raw facts are undisputed, this is such a case.

We also reject Federal's intimation that mixed questions of fact and law invariably demand de novo review. The scope of review for mixed questions varies. The more fact-intensive the inquiry, the more likely we are to apply clear error review; the more law-dominated the inquiry, the more likely we are to undertake de novo review. Sierra Fria Corp. v. Evans, 127 F.3d 175, 181 (1st Cir. 1997); United States v. Howard (In re Extrad. of Howard), 996 F.2d 1320, 1327-28 (1st Cir. 1993). Probing the existence of a fraudulent conveyance customarily is a factbound inquiry, subjecting the court's findings to clear error review. See, e.g., Beal Bank v. Pittorino, 177 F.3d 65, 69 (1st Cir. 1999); Barrett v. Cont'l Ill. Nat'l Bank & Trust Co., 882 F.2d 1, 3-4 (1st Cir. 1989). This result commends itself with particular force where, as here, a claim turns on elusive issues of motive or intent. See Crellin Techs., Inc. v. Equipmentlease Corp., 18 F.3d 1, 7 (1st

-18-

Cir. 1994); see also Cumpiano, 902 F.2d at 152 (counseling that "[f]indings concerning an actor's intent fit neatly within the integument of the 'clearly erroneous' rule"). We are satisfied, therefore, that the standard of review applicable to the lower court's disposition of counts II through IV is clear error.

## B. **Constructive Fraud**.

We turn now to the trial court's findings. Setting aside a conveyance for constructive fraud under UFCA § 4 requires both a finding that the transferor was insolvent at the time of the transfer (or was rendered insolvent thereby) and a finding that the conveyance was made without fair consideration. Implicit in this analytic framework is the assumption that the factfinder first must identify the relevant transferor. See Boston Trading Group, 835 F.2d at 1509. Here, the district court concluded that the corporations were the relevant transferors:

> [T]aking all the evidence and the reasonable inferences therefrom, the court is not persuaded that at the time of that restructuring the corporations, who were actually the ones who were making the conveyance of their stock, were thereby rendered insolvent. (Emphasis supplied.)

Federal mounts two attacks on the district court's finding. First, it pounces on a mistake embedded in the court's articulation and labors to persuade us that this bevue discredits the court's conclusion. Second, it posits that the finding is clearly erroneous. Neither attack succeeds.

-19-

To be sure, the district court misspoke at one point in its bench decision: there was no conveyance of stock involved in the creation and funding of the limited partnerships. Rather, the shareholders of the parent company (Essex) voted to create the limited partnerships, and each subsidiary corporation then transferred its real estate to its newly formed limited partnership.

From all indications, the court's passing mention of a stock transfer amounts to a slip of the tongue, substituting "stock" for "real estate." The record as a whole makes it crystal clear that the court squarely decided the identity question. At the start of the trial, the court put its finger on the problem, asking Federal's counsel, "[w]ho . . . caused [the limited partnerships] to be set up?" Counsel's response framed the two possible answers to this query — either (i) Essex and the subsidiary corporations (as the donors of the real estate), or (ii) Romano (whom Federal endeavored to depict as the "actual" transferor). Trial of the limited partnership claims focused on which of these proposed answers was correct (i.e., who should be deemed the transferor). The court proceeded to resolve this question.

We have held before that a reasoned decision should not be vacated merely because a lapsus linguae occurred. See, e.g., Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1088 (1st Cir. 1993);

-20-

<u>Clauson</u> v. <u>Smith</u>, 823 F.2d 660, 663 n.3 (1st Cir. 1987).  So it is here:  taken in context, the district court's infelicitous choice of words does not undermine the cogency of its determination.

Moving to the next plateau, we perceive no clear error in the court's conclusion that the corporations, not the individual defendants, were the relevant transferors.  It is undisputed that Essex and its subsidiaries formed the limited partnerships and deeded the real estate to them.  Although Romano apparently voted his shares (or, more precisely, the shares standing in the name of the B&T Trust) in favor of the restructuring, there is no direct evidence to support a finding that he was the driving force behind the decision.  Romano was not the majority shareholder, and he testified that he was not "in a position to either block or approve what took place."  While we may regard Romano's assertion as suspect, weighing the evidence and assessing the witnesses' credibility is uniquely the province of the district court.  Here, there were two permissible views of the evidence.  In such a circumstance, the factfinder's choice between those competing views cannot be clearly erroneous.  <u>Anderson</u>, 470 U.S. at 574; <u>Keyes</u>, 858 F.2d at 1020.

That ends this phase of our inquiry.  Given the court's supportable finding as to the identity of the transferors, Federal's claim of constructive fraud must fail.  Viewing the corporations as the transferors, there is no evidence that they

were insolvent either at the time of the transfers or immediately thereafter.

## C. **Actual Fraud**.

This leaves Federal's claim under UFCA § 7.  Our analysis of this claim is straightforward.  Setting aside a conveyance for actual fraud requires, at a bare minimum, a finding of "actual intent . . . to hinder, delay or defraud either present or future creditors."  Palmer v. Murphy, 677 N.E.2d 247, 254-55 & n.15 (Mass. App. Ct. 1997) (construing UFCA § 7).  The court below found as a matter of fact that the limited partnerships were created and funded for a legitimate business purpose rather than to hinder, delay, or defraud creditors.  This finding is not clearly erroneous.

Klock testified that the reason for the restructuring was to obtain HUD financing to rehabilitate the nursing homes. According to Klock, HUD required, as a condition of each loan, that the real estate be separated from the operating entity.  The limited partnerships provided the vehicles for that separation. Despite countervailing evidence suggesting that the purpose behind the restructuring was to dilute the value of Romano's stock, the trial court was free to choose between the two versions of the truth and draw appropriate inferences.  See Anderson, 470 U.S. at 574; Keyes, 853 F.2d at 1020.  Consequently, we uphold the court's rejection of the actual fraud claim.

## VI. THE TRANSFER TO ESSEX

We come now to the order setting aside the post-trial transfer of Romano's well-traveled shares to Essex.[5]  In response to Federal's motion to annul that transfer, the district court held a status conference on June 17, 2002.  Although the court set the matter down for hearing eight days hence, it was vague as to how that hearing would proceed.  When the appointed date arrived, the court declined to take testimony, instead inviting oral argument and telling the parties that it was treating the hearing "functionally as a motion for summary judgment."

After listening to the lawyers' arguments, the court reserved decision.  It subsequently filed a written rescript in which it ruled, as a matter of law, that the transfer must be rescinded.  Fed. Refin., 229 F. Supp. 2d at 28.

### A.  Standard of Review.

In view of the court's explicit statement at the June 25 hearing, we invoke our familiar summary judgment jurisprudence. Under that rubric, we, like the district court, must accept the facts most favorable to the nonmoving party (here, Romano) and draw all reasonable inferences to that party's behoof.  Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990).  We review the

---

[5]Essex, qua intervenor, joins Romano in prosecuting this appeal (No. 02-2547).  With respect to this issue, Essex's and Romano's rights are congruent.  For simplicity's sake, therefore, we treat Romano as if he were the sole appellant.

district court's entry of summary judgment de novo.  Id.  We will affirm only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

When a party moves for summary judgment and suggests that no trialworthy issues exist, that party ordinarily must support the motion with affidavits or other materials of evidentiary quality.  Plumley v. S. Container, Inc., 303 F.3d 364, 368 (1st Cir. 2002).  The burden of production then shifts to the nonmovant to show that a genuine issue looms.  Garside, 895 F.2d at 48.  The protocol differs, however, as to issues on which the nonmovant bears the burden of proof.  As to such issues, the movant is not obliged to make an initial evidentiary showing.  Rather, it is incumbent upon the nonmovant to demonstrate, in the first instance, that specific facts exist sufficient to create an authentic dispute.  Id.

### B.  **The Preference Claim**.

As said, the UFTA controls with respect to Federal's claim that a preferential transfer occurred.  See supra Part III.  That statute empowers a court to set aside a transfer as preferential if (i) the creditor's claim arose before the transfer occurred, (ii) the transfer was made to an insider on account of an antecedent debt, (iii) the debtor was insolvent at the time of the

transfer, and (iv) the transferee had reasonable cause to believe that the debtor was insolvent. Mass. Gen. Laws ch. 109A, § 6(b).

Romano first posits that a genuine issue of material fact existed vis-à-vis his solvency at the time Essex redeemed his stock. As the moving party, Federal bore the initial burden of producing evidence of Romano's insolvency. Plumley, 303 F.3d at 368.

A finding of insolvency requires proof of both liabilities and assets. See First Fed. Sav. & Loan, 701 N.E.2d at 353-55. The papers before the district court contained evidence tending to show that Romano's debts exceeded $17,000,000 at the time of the transfer. But Federal provided next to no evidence on the asset side of the ledger. It merely asked the court to take judicial notice of the prior ruling that Romano's only significant asset was the Essex stock and pointed out that Romano had purportedly "sold" the stock to Essex for an $85,000 credit on an antecedent debt and a ten-year forbearance agreement as to the balance of that debt.

We agree with Romano that this evidence was insufficient to permit a reasoned calculation of the value of his assets (and, thus, of his financial condition). A finding of insolvency requires more than a showing of formidable debt; it also requires a corresponding showing as to the debtor's assets. The fact that Romano had no assets besides the Essex shares in 1988 — some

fourteen years before the date of the transfer in question — told the court very little about the extent of his holdings in 2002. While it may be likely that the value of Romano's assets was less than the amount of his liabilities, summary judgment cannot be granted on the basis of informed intuitions. "The precincts patrolled by Rule 56 admit of . . . no room for the judge to superimpose his own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon the carapace of the cold record." Greenburg v. P.R. Marit. Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987). A court considering a summary judgment motion cannot simply presume that plaintiffs will win cases that seem open and shut. See Leyva v. On the Beach, Inc., 171 F.3d 717, 720 (1st Cir. 1999).

In granting summary judgment, the court below glossed over this evidentiary defect. It noted the mountain of debt facing Romano and then suggested that it was "undisputed" that this debt exceeded the dollar value of Romano's assets. Fed. Refin., 229 F. Supp. 2d at 28. We have been over the record with a fine-tooth comb and cannot find any such concession. During the June 25 hearing, Romano's counsel acknowledged that the court earlier had found Romano insolvent, but then reminded the court that the situation had changed. Counsel stated:

> There has to be a valuation hearing and a trial on the merits to find out if the items that were conveyed by Mr. Romano to Essex were conveyed by someone who was then insolvent. .

-26-

> . . That's a factual issue that can't be glossed over and can't be determined in this kind of proceeding. (Emphasis supplied.)

That statement squarely raised the insolvency question. Thus, the district court erred in treating the fact as undisputed.

That error undermines the order for summary judgment. On this record, Federal simply did not carry its burden of production anent the insolvency question. Whatever the evidence eventually may show regarding the ratio of Romano's assets to his liabilities — a matter on which we take no view — we are constrained at this stage to rule that summary judgment was improvidently granted.

Romano also argues that other genuine issues of material fact remained unresolved at the time that the district court granted summary judgment. To this end, he points us to a series of defenses available under UFTA § 9. For the sake of completeness, we examine this argument as well. We use UFTA § 9(f)(2) as an exemplar.

The UFTA provides that even if a transfer meets the criteria for avoidance set out in UFTA § 6, a court may not set it aside so long as it was "made in the ordinary course of business or financial affairs of the debtor and the insider." Mass. Gen. Laws ch. 109(a), § 9(f)(2). That provision constitutes an affirmative defense, and, thus, the burden of proof falls on the party asserting it. See Prairie Lakes Health Care Sys., Inc. v. Wookey, 583 N.W.2d 405, 414 & n.7 (S.D. 1998) (concluding that the burden

-27-

of proving section 9 defenses falls on the party asserting them). In order to avoid summary judgment, therefore, Romano typically would have to shoulder the burden of adducing specific facts tending to show that his transfer of shares to Essex was a transaction undertaken in the ordinary course of business.

Romano asserted the section 9(f)(2) defense at the June 25 hearing. He did not, however, adduce any evidence in support of it. In the usual case, mere assertions of counsel are not enough to block summary judgment. See Dow v. United Bhd. of Carpenters and Joiners, 1 F.3d 56, 58 (1st Cir. 1993); Brennan v. Hendrigan, 888 F.2d 189, 191 (1st Cir. 1989). Federal urges us to apply that rule here.

Federal's argument overlooks the atypical procedural posture in which this question arose. Federal's motion to set aside the post-trial transfer was not couched as a motion for summary judgment. At the June 17 status conference — the first time the district court addressed Federal's motion — the court set the matter down for hearing on June 25, stating that it would attempt to resolve the motion "as a matter of law" and that if it could not do so it would try the matter.

These comments were imprecise. Although the court may have intended all along to hold a summary judgment hearing, it did not say so. No motion for summary judgment had been made, and the docket entry reveals that the clerk scheduled June 25 as the first

day for "a jury-waived trial." To confuse matters further, the court neither specifically mentioned summary judgment nor asked the parties to prepare affidavits or other evidentiary submissions before the June 25 hearing.

Courts have recognized that summary judgment is strong medicine, and the rules provide that parties must be given adequate notice of summary judgment proceedings and a reasonable time within which to proffer supporting documents. See, e.g., Rogan v. Menino, 175 F.3d 75, 80 (1st Cir. 1999); Stella v. Town of Tewksbury, 4 F.3d 53, 55 (1st Cir. 1993). Indeed, Rule 56(a) anticipates that a party opposing summary judgment will have a ten-day window within which to prepare and present evidence in opposition. We have taken special pains to emphasize the importance of this temporal window in cases — analogous to this one — involving sua sponte grants of summary judgment. The district court must "first give[] the targeted party notice and a chance to present its evidence on the essential elements of the claim or defense." Berkovitz v. Home Box Office, Inc., 89 F.3d 24, 29 (1st Cir. 1996); accord Leyva, 171 F.3d at 720; Stella, 4 F.3d at 55-56.

Viewed against this backdrop, the district court's ruling cannot withstand scrutiny. No motion for summary judgment had been filed, and nothing in the court's instructions prior to June 25 alerted Romano to the need to produce evidentiary support for his

affirmative defenses.[6] Accordingly, the first real notice that the court would treat the matter under the framework applicable to summary judgment motions came on the day of the hearing: June 25. Thus, the procedure followed in this case flouted the imperatives of Rule 56. See Berkovitz, 89 F.3d at 30. The result was that Romano had neither advance notice of the district court's intentions nor an adequate opportunity to proffer evidence.

We need go no further. By its very nature, a section 9(f)(2) defense requires a fact-specific inquiry into the workings of the transferor and the transferee and the specific nature of the transactions between them. Federal's proffers do not conclusively demonstrate the futility of a section 9(f)(2) defense and, in the peculiar circumstances of this case, we cannot hold Romano's failure to lay a solid factual foundation for that defense against him. Consequently, the issue remains open, and the entry of summary judgment must be vacated.[7]

---

[6]Assuming, for argument's sake, that the court's comments on June 17 hinted that it might conduct a summary judgment hearing on June 25, the intervening time was plainly less than the ten-day interval that Rule 56 requires.

[7]Romano's brief also mentions possible defenses under UFTA § 9(f)(1) and (f)(3). Like the section 9(f)(2) defense, these defenses call for fact-specific inquiries — and Romano had no fair opportunity to produce evidence regarding them. Thus, Romano remains free to litigate these issues upon remand.

**VII.  CONCLUSION**

We affirm the district court's orders setting aside the 1988 stock transfer and refusing to collapse the limited partnership structures.  However, in light of procedural irregularities and the existence of unresolved factual disputes, we vacate the lower court's entry of what amounted to a sua sponte summary judgment regarding the 2002 stock transfer and remand for further proceedings consistent with this opinion.  We leave intact the court's provisional appointment of a receiver to hold the embattled shares until such time as their fate is resolved.

**<u>Affirmed in part, vacated in part, and remanded</u>**.  **<u>All parties shall bear their own costs</u>**.